253 N.J. Super. 515 (1991)
602 A.2d 733
BOARDWALK PROPERTIES, INC., A NEW JERSEY CORPORATION, AND PENTHOUSE INTERNATIONAL, LTD., A NEW YORK CORPORATION, PLAINTIFFS-RESPONDENTS,
v.
BPHC ACQUISITION, INC., A NEW JERSEY CORPORATION, BPHC PARKING CORP., A NEW JERSEY CORPORATION, AND PRATT HOTEL CORP., A DELAWARE CORPORATION, DEFENDANTS/THIRD-PARTY PLAINTIFFS/APPELLANTS. COLUMBUS PLAZA ASSOCIATES, A/K/A HOLLYWOOD PARKING ASSOCIATES, A NEW JERSEY PARTNERSHIP AND PCPI FUNDING CORP., A DELAWARE CORPORATION, DEFENDANTS,
v.
DONALD J. TRUMP, TRUMP PLAZA ASSOCIATES, A NEW JERSEY GENERAL PARTNERSHIP, AND ROBERT C. GUCCIONE, THIRD-PARTY DEFENDANTS/RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 29, 1991.
Decided July 24, 1991.
*518 Before Judges ANTELL, O'BRIEN and KEEFE.
David J. Sheehan argued the cause for the defendants/third-party plaintiffs/appellants BPHC Acquisition, Inc., BPHC Parking Corp. and Pratt Hotel Corporation (Crummy, Del Deo, Dolan, Griffinger & Vecchione, attorneys, David J. Sheehan, Brian J. McMahon and Guy V. Amoresano, on the brief).
Paul A. Rowe argued the cause for the plaintiffs-respondents, Boardwalk Properties, Inc., Penthouse International, Ltd., and Robert C. Guccione (Greenbaum, Rowe, Smith, Ravin & Davis, attorneys for Boardwalk Properties, Inc. and Robert C. Guccione, Paul A. Rowe, of counsel, Alan S. Naar, Bruce D. Greenberg and Gary K. Wolinetz, on the brief, Kozlov, Seaton & Romanini, attorneys for Penthouse International, Ltd.)
John J. Barry argued the cause for third-party defendants/respondents, Trump Plaza Associates and Donald J. Trump (Clapp & Eisenberg, attorneys for respondent, Donald J. Trump, John J. Barry, Salvatore T. Alfano, Agnes I. Rymer and Madeline E. Cox, on the brief, McGahn, Friss & Miller, attorneys for respondent Trump Plaza Associates).
The opinion of the court was delivered by KEEFE, J.A.D.
*519 Defendants/Third-Party plaintiffs, BPHC Acquisition, Inc. and BPHC Parking Corp. (BPHC), appeal from the denial of their motion to have the merits of their counterclaim and third-party claim tried by a jury either in the Chancery Division, where the matter is now pending, or in the Law Division where they sought to have the matter transferred.
Plaintiff Boardwalk Properties, Inc. and Penthouse International, Ltd. (BPI) owned a parcel of land in Atlantic City adjacent to the Trump Plaza Hotel & Casino on which it originally intended to build a casino. That plan was abandoned sometime before August 17, 1987 when BPI and BPHC entered into an agreement (the Agreement) wherein BPHC agreed to purchase the site for $40 million. The Agreement also provided that BPHC would acquire an option held by BPI to purchase a Holiday Inn located on the Boardwalk section of the site for $21 million.
Contemporaneous with the Agreement, the parties also signed an escrow agreement (the Escrow Agreement) under which the Agreement and BPHC's deposit were held in escrow. The purpose of the Escrow Agreement was to permit the parties to negotiate the purchase of the contiguous Bongiovanni Parcel and other "out-parcels" adjacent or proximate to the site that BPHC deemed essential to the transaction and its proposed casino hotel development. The Escrow Agreement provided that the Agreement would be terminated unless BPI immediately contracted to acquire the Bongiovanni Parcel. In October, 1987, Bongiovanni agreed to sell that property to BPI for $1.9 million.
Under a subsequent assignment and repurchase agreement (the Repurchase Agreement), BPI assigned its rights in the Bongiovanni Parcel to BPHC, who then acquired it. The Repurchase Agreement further provided that, if the Agreement was terminated, BPHC would convey the Bongiovanni Parcel to *520 BPI at a price based on a formula contained in the Repurchase Agreement.
The Agreement provided for a closing date of January 15, 1988. However, BPHC was permitted to extend the closing date twice, until April 29, 1988. Additionally, if on March 14, 1988 the appeal period for certain zoning approvals had not yet expired, or an appeal from the approvals was pending, BPHC would adjourn the closing beyond the April 29th date. The Agreement, however, required BPHC, as a condition for obtaining this final extension, to show that it had a financial source for the full $40 million required by BPHC in order to close. Upon such a showing, the Agreement provided that the closing could be adjourned until December 15, 1988, the latest date provided in the contract for closing of title.
In early 1988, BPHC filed its application for preliminary site plan approval. Opponents of the approvals, including the Trump defendants, focused on traffic impact and the lack of identified parking. The preliminary approval ultimately obtained by BPHC was subject to conditions regarding parking. Thus, BPHC identified a site, known as the Columbus Plaza Site, a group of lots within one block of the main site, as critical to its resolution of the parking problem and to its ability to obtain final site plan approval. Years earlier, BPI had acquired a 25% interest in Columbus Plaza Associates (CPA), a partnership which owned the Columbus Plaza site. In February 1987, an involuntary bankruptcy proceeding was filed against CPA. On October 24, 1988, one day before a scheduled auction sale of the Columbus Plaza site in the CPA bankruptcy proceedings, BPI and BPHC agreed to jointly purchase the Columbus Plaza site so that it could service the parking needs of BPHC's proposed casino.
On November 30, 1988, the parties jointly closed on the Columbus Plaza site and entered into a written Partnership Agreement reconstituting CPA as Hollywood Parking Associates (HPA). That Partnership Agreement provided that if *521 closing did not occur under the Agreement, for any reason, HPA was to sell the Columbus Plaza site to a third party. A separate letter agreement provided that BPI would be that third party.
In the summer of 1988, BPHC sought to negotiate an extension of the December 15th closing date. There is some dispute in the record as to whether an extension was ever agreed upon. In any event, on December 6, 1988, Donald Trump apparently advised David Myerson, BPI's president and general counsel, that he was interested in acquiring the site if BPHC did not close. Myerson told Trump he was going to give BPHC more time to close. Thereafter, BPI extended the closing date until February 1, 1989, making time of the essence. Its extension letter advised that BPI had another offer that it would look to if BPHC failed to close. No closing occurred by February 1, 1989. By letter dated February 1, 1989, BPI advised BPHC that its contract rights had expired, but that BPI was willing to continue to negotiate although it was no longer contractually bound. BPHC took the position that certain preconditions for a closing date, which were within the control of BPI to perform, had not been met and thus the claimed time of the essence was of no legal effect. BPHC threatened to file suit to enforce its rights under the contract.
On March 19, 1989, BPI and Trump executed their contract and had a simultaneous closing.
With the Agreement terminated, BPI claimed entitlement to conveyance of the Bongiovanni parcel and the Columbus Plaza site. When BPHC refused to comply, BPI instituted this litigation, seeking specific performance regarding those sites. BPHC filed an answer, counterclaim and third-party complaint against Donald J. Trump, Trump Plaza Associates, and Robert C. Guccione as third-party defendants. Its pleading, entitled "Answer, Affirmative Defenses, Counterclaim and Third-Party Complaint", filed by counsel other than counsel now representing *522 BPHC, demanded "a trial by jury for all issues so triable in this action."
In a certification filed with the court in connection with a related matter, the Secretary and General Counsel of BPHC characterized the pleading filed in response to BPI's complaint as follows: "[t]he critical issue in [this] action is whether this Court should rescind the sale of two related casino properties to Donald Trump ("Trump") and require specific performance of an Agreement of Sale dated as of August 17, 1987 between BPI and BPHC (the "Casino Site Agreement")." In describing the relief sought by BPHC in its pleadings, he said that BPHC requested, "inter alia, rescission of the sale of the casino property to Trump and specific performance of the casino site Agreement between BPI and BPHC."
On November 29, 1989, during the course of an unrelated motion, counsel for BPHC raised the issue which generated this appeal, i.e., whether a jury would hear the case. As a result of colloquy between the court and counsel, it was suggested that the matter be placed before the court in a formal manner by way of motion. The motion was ultimately filed in March, 1990 and heard on August 1, 1990. In a bench opinion rendered on that date, Judge Anthony Gibson for the Chancery Division denied BPHC's application for a jury trial. We denied BPHC's motion for leave to appeal that interlocutory order.
Subsequently, BPHC moved to amend its answer, counterclaim and third-party complaint to strike all equitable remedies from each of their pleadings so as to leave only legal remedies for each cause of action pleaded. In addition, BPHC moved to strike BPI's equitable claims regarding the Columbus Plaza site and the Bongiovanni parcel on the grounds that BPHC now consented to the sale or transfer of the subject property to BPI. In the same motion, BPHC asked the trial court to reconsider its prior decision denying BPHC the right to trial by jury or, in the alternative, requested the matter be transferred to the Law Division for a jury trial.
*523 There was no opposition to BPHC's effort to amend its pleadings to remove its affirmative claims for equitable relief and enter its consent to BPI's claim for equitable relief relative to the Bongiovanni and Columbus Plaza parcels. Thus, the judge granted that aspect of the motion. However, while acknowledging that the "case now is predominantly one that involves legal claims and the relief that is sought is predominantly legal relief", he denied the motion to reconsider in all respects. Succinctly stated, the judge determined that the question of whether a party had a right to trial by jury in the Chancery Division must be determined at the beginning of the case and not by the voluntary conduct of a party during the course of the litigation who removes the equitable remedies that formed the principal grounds for relief in the initial pleadings. BPHC's motion for leave to appeal from that interlocutory order was granted.
The focal point of the appeal is best stated in BPHC's own words:
BPHC submits that the expansive view of the scope of the ancillary, non-jury `jurisdiction' of Chancery espoused by the trial court must be rejected in light of developments in the entire controversy doctrine which post-date the cases relied upon below. Otherwise, defendants like BPHC will be faced with the constitutionally infirm Hobson's choice of either joining legal claims to actions commenced in Chancery, and thus losing their jury right, or withholding the claims, and thus finding them barred by the entire controversy doctrine.
BPHC contends that its 15 count counterclaim/third-party complaint represents compliance with the mandate of Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 476 A.2d 250 (1984) and Cogdell v. Hospital Center at Orange, 116 N.J. 7, 560 A.2d 1169 (1989). It acknowledges that its initial pleadings asserted equitable claims, e.g. rescission of the BPI-Trump Agreement, the imposition of a constructive trust on the property and specific performance of its contract of BPI. However, it also points out that it asserted other legal theories sounding in both contract and tort against BPI and the third-party defendants seeking money damages, including a treble damage claim under the New Jersey Antitrust Act (the Act). It claims that its *524 damages could approach $700 million. The argument implies that, had it not been compelled to join all of these claims against all possible parties arising out of the same controversy, BPHC would have been able to obtain a trial by jury in an action in the Law Division. Thus, BPHC reasons that the entire controversy doctrine combined with the "ancillary equitable jurisdiction" doctrine works to deprive it of the right to trial by jury guaranteed by Article I, para. 9 of the New Jersey Constitution. Consequently, BPHC contends on appeal that the trial judge erred when he exercised ancillary equitable jurisdiction over claims which BPHC asserts are purely legal in nature and that he confused the concept of the "jurisdiction" of the Chancery Division with the "ancillary jurisdiction" of equity. It also claims that the judge erred when he held that there is no entitlement to trial by jury under the New Jersey Antitrust Act and when he declined to transfer this matter to the Law Division.
We disagree with BPHC's contentions and affirm the judgment under review substantially for the reasons stated by Judge Gibson in his bench opinions of August 1, 1990 and December 20, 1990. However, because we do not completely endorse the trial judge's analysis, we address briefly certain aspects of the issues presented that require clarification.
First, it is not accurate to say that the entire controversy doctrine did not exist at the time the seminal cases of Fleischer v. James Drug Stores, Inc., 1 N.J. 138, 62 A.2d 383 (1948); Steiner v. Stein, 2 N.J. 367, 66 A.2d 719 (1949); Massari v. Einsiedler, 6 N.J. 303, 78 A.2d 572 (1951) and O'Neill v. Vreeland, 6 N.J. 158, 77 A.2d 899 (1951) were decided. As Justice Handler cogently pointed out in Cogdell, supra,
[t]he doctrine has become such a fundamental aspect of judicial administration, it has achieved constitutional confirmation. Article 6, section 2, paragraph 4 of the 1947 Constitution states:
Subject to rules of the Supreme Court, the Law Division and the Chancery Division shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief should be *525 granted in any cause so that all matters in controversy between the parties may be completely determined.
Id. 116 N.J. at 15, 560 A.2d 1169. Actually, the jurisprudence undergirding the constitutional doctrine began well before the 1947 Constitution. Id. at 15-16, 560 A.2d 1169. This is especially important to understand when interpreting the constitutional guarantee to trial by jury found in Article I, para. 9 of the 1947 Constitution. However, practicing attorneys did not immediately grasp the broad expanse of the entire controversy doctrine embraced by the Constitution. Thus, it took several years of case law to flesh out its scope. (See historical discussion at Id. 16-17, 560 A.2d 1169.)
The significance of Crispin and Cogdell in our view is not that they represent the ultimate requirement that all claims be joined in one litigation but rather the requirement that "all persons who have a material interest in the controversy" be joined in the litigation. Cogdell, supra, 116 N.J. at 26, 560 A.2d 1169. But even that new rule required only the joinder of parties who prior to Cogdell were considered to be only "necessary" or "proper." Id. at 20, 560 A.2d 1169. Cogdell did not change the common law rule that required the joinder of "indispensable" parties. Id. at 18, 560 A.2d 1169.
When viewed in the context of the original pleadings filed by BPHC, it is hard to imagine how the Trump defendants could be other than indispensable to that part of the litigation which sought to rescind the contract between BPI and Trump and impose a constructive trust over the property. That being the case, it was then incumbent upon BPHC to also assert any other claims it had against the Trump defendants arising out of the same controversy in that litigation. Thus, as we see it, neither Crispin nor Cogdell required BPHC to do anything more than the well established principles of the entire controversy doctrine had previously mandated. Stated simply, neither Crispin nor Cogdell had an impact on BPHC in the context of this case.
*526 Second, there is a distinction to be made between the jurisdiction of the Chancery Division to resolve all claims brought before it by the parties, and the power of the General Equity judge to adjudicate certain facially legal claims without a jury. In our view, the latter is more restrictive than the former.
The jurisdiction of the Chancery Division to adjudicate all controversies brought before it and render both legal and equitable remedies is co-extensive with that of the Law Division. Our court rules simply establish a preference and procedure for determining the appropriate forum for a specific claim. Thus, cases in which the "primary right or the principal relief sought is equitable" should be filed in the Chancery Division. R. 4:3-1(a)(1). However, the rule is not jurisdictional. If a matter which seeks principally equitable relief is inappropriately filed in the Law Division, the Law Division has the constitutional power to afford equitable relief. Likewise, if an otherwise legal action is inappropriately filed in the Chancery Division, the Chancery Division has the jurisdictional power to afford the necessary legal relief. Thus, one of the earliest decisions addressing this conceptual change in the practice of law brought about by the 1947 Constitution made it clear that:
[W]here an action is brought which in the first instance is cognizable in the Chancery Division, it should be retained in that division irrespective of the fact that before or during the trial the equitable phases of the cause have been fully disposed of, leaving only purely legal issues remaining for determination[.]
Steiner, supra, 2 N.J. at 378, 66 A.2d 719. (citation omitted).
However, it was also made clear early on that the question of forum, i.e., whether Law Division or Chancery Division, was not determinative of a party's right to trial by jury implicated by Article I, paragraph 9 of the Constitution.
Whether the action be brought in the Law Division or the Chancery Division, all issues of fact triable as of right by a jury shall be decided by a jury, unless the right to jury trial be waived, expressly or impliedly, [R. 4:35-1].... All issues of fact not triable of right by a jury, except as provided by [R. 4:35-1(d)], are to be determined by the court without a jury and when certain issues are to be decided by the court and others by a jury, the court may determine the *527 sequence in which such issues shall be tried, [R. 4:35-3].... It is within the contemplation of the Constitution and the rules that a jury trial may be had in the Chancery Division of the Superior Court and we so indicated in Steiner v. Stein, supra, 2 N.J. 367, 378 [66 A.2d 719] (Sup.Ct. 1949):
The other fundamental issue in the case is whether the defendant Stein is entitled to a trial by jury as of right before the judge of the Superior Court in the Chancery Division before whom this proceeding was commenced and before whom, in our view, all the issues of the controversy should be tried.
O'Neill, supra, 6 N.J. at 167-168, 77 A.2d 899.
Thus, the essential question is not whether the Chancery Division has the jurisdiction to dispose of legal claims in matters initially cognizable in Chancery, even though all the equitable claims have been resolved, because it clearly has such jurisdiction, but whether the legal issues now sought to be tried by jury were "triable without a jury under the Constitution of 1844." If they were triable without a jury then they are also triable without a jury under the Constitution of 1947. Steiner, supra, 2 N.J. at 379, 66 A.2d 719. In order to make that analysis one must look to the jurisdiction of the court of equity prior to the 1947 Constitution. If a court of equity, prior to 1947, would have considered the legal issue "ancillary" or "incidental" to the cognizable equitable claim, then the issue was triable without a jury. This is the analytical process suggested by Fleischer, supra, 1 N.J. at 150, 62 A.2d 383; Steiner, supra, 2 N.J. at 379, 66 A.2d 719; and O'Neill, supra, 6 N.J. at 169, 77 A.2d 899. As Fleischer points out, "[t]he constitutional right of trial by jury is ... subject to this inherent equitable jurisdiction." 1 N.J. at 150, 62 A.2d 383.
It was clear prior to the 1947 constitution that the ancillary power of the court of equity to adjudicate legal claims was tested by the facts existing at the inception of the suit. Thus, if the primary relief sought by the complainant was equitable in nature, equity had jurisdiction to settle all issues, even though purely legal in nature, where subsequent events made it impractical or unnecessary to award equitable relief. Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379, 393, 55 A.2d 250 (E. & A. 1947). It had also been well established *528 that a court of equity had the power to assess unliquidated damages even though it was acknowledged that such damages were "the peculiar function of a jury" once it was determined that the "cause [was] otherwise within its control and the interest of justice [would] be served by that course." Middlesex Concrete, & c., Co. v. Northern States Imp. Co., 129 N.J. Eq. 314, 317, 19 A.2d 48 (E. & A. 1940). In Fleischer, supra, these common law principles were refined and condensed by the Supreme Court to identify Chancery's power to adjudicate legal matters without a jury if the issues are "germane to or grow out of the subject-matter of the equitable jurisdiction." 1 N.J. at 150, 62 A.2d 383.
However, it is incorrect to assume that all claims arising out of the same controversy are "germane to or grow out of the subject matter of the equitable jurisdiction." Indeed, legal claims may grow out of a controversy that are independent of the equitable action. For example, in N.J. Highway Authority v. Renner, 18 N.J. 485, 114 A.2d 555 (1955) the defendant's counterclaim for damages based upon the plaintiff's alleged wrongful interference with her right to remove a building from property condemned by the plaintiff was completely "independent" of plaintiff's claim for specific performance. Id. at 494, 114 A.2d 555. Thus, the adjudication of the specific performance claim by the Chancery Division did not dispose of defendant's claim for legal relief which was triable by jury.
Although Judge Gibson did not analyze the issues in precisely this way, his analysis correctly utilized these principles. He reviewed the pleadings filed by both BPI and BPHC and determined appropriately that both the complaint, the counterclaim and third-party complaint were essentially equitable in nature. He then viewed the various legal claims presented and concluded that both the issues and facts were so intertwined with the equitable issues that the legal issues fell within the court's power to adjudicate them without a jury. See, Apollo v. Kim Anh Pham, 192 N.J. Super. 427, 432, 470 A.2d 934 (Ch. *529 Div. 1983), aff'd o.b. 224 N.J. Super. 89, 539 A.2d 1222 (App.Div. 1987).
Finally, we conclude that the trial judge was correct in his determination that trial by jury is not afforded to BPHC on its New Jersey Antitrust Act (Act) claim found in count two of the counterclaim/third-party complaint. However, we affirm solely on Judge Gibson's analysis of the issue applying the principles of Shaner v. Horizon Bancorp., 116 N.J. 433, 561 A.2d 1130 (1989).
The Act omits any reference to a jury trial. Id. at 443, 561 A.2d 1130. Such an omission is "highly indicative of legislative intent not to confer such a right" in view of our Legislature's practice of expressly providing for jury trials when such is intended. Id. Moreover, BPHC's reliance upon the provision of N.J.S.A. 56:9-18 is misplaced. That provision requires State courts to consult judicial interpretations of the federal antitrust statute in order to establish uniformity in the manner in which the Act is applied to the conduct of parties. The right to trial by jury is considered to be a procedural issue rather than a substantive one and thus usually decided by "the internal law of the forum." Ettelson v. Metropolitan Life Ins. Co., 137 F.2d 62, 64 (3d Cir.1943), cert. denied, 320 U.S. 777, 64 S.Ct. 92, 88 L.Ed. 467 (1943). In any event, the right to trial by jury afforded defendants in civil suits under the federal statute is afforded not by reason of an interpretation of that statute but rather as a result of the application of the Seventh Amendment to the United States Constitution. In re Japanese Electronic Products Antitrust Litigation, 631 F.2d 1069, 1078 (3d. Cir.1980); Standard Oil Co. of Cal. v. Arizona, 738 F.2d 1021, 1025 (9th Cir.1984), cert. denied, 469 U.S. 1132, 105 S.Ct. 815, 83 L.Ed.2d 807 (1985).
The equitable remedy of injunctive relief and the legal remedy of money damages are available to a private litigant under the Act. In this case, BPHC sought both remedies. However, it contends that when it elects both of the *530 remedies available to it, the claim cannot be characterized as "predominately equitable in nature." Shaner, supra 116 N.J. at 453, 561 A.2d 1130. That, in our view, is a myopic view of the statute. The purpose of the Act is the prevention of trade restraining practices which have a tendency to deprive the public of benefits ordinarily derived from a competitive market. While a private litigant may financially gain from a suit under the statute, the overriding purpose of the Act is to advance the public policy in favor of competition. Glasofer Motors v. Osterlund, Inc., 180 N.J. Super. 6, 433 A.2d 780 (App.Div. 1981); Chick's Auto Body v. State Farm Auto. Ins. Co., 168 N.J. Super. 68, 401 A.2d 722 (Law Div. 1979), aff'd 176 N.J. Super. 320, 423 A.2d 311 (App.Div. 1980). Moreover, when the statute is viewed as a whole, the available remedies afforded to the Attorney General in prosecuting civil actions under the statute combined with the remedies available to a private litigant are predominantly equitable in nature. N.J.S.A. 56:9-10(b) (injunctive relief against threatened loss or damage to property or business by a violation of the Act); 56:9-10(b) and N.J.S.A. 56:9-12(a) (reasonable attorneys' fees, filing fees and cost of suit); N.J.S.A. 56:9-7 (forfeiture of charter rights, franchises, privileges and powers, and dissolution of the corporation or association); N.J.S.A. 56:9-8 (revocation or suspension of a foreign entity's privileges within the State).
Finally, we are not persuaded by BPHC's argument that the Act simply replaced common law causes of action which were triable to a jury. While it is possible to trace some of the roots of the antitrust statutes to the common law, the statute has "distinctive features with respect to substantive and procedural standards that would render them virtually unknown to the common law, [and thus] there is no right to jury trial." Shaner, supra, 116 N.J. at 451, 561 A.2d 1130.
Affirmed.