678 A.2d 683

LYN–ANNA PROPERTIES, LTD., ALAN HUSAK AND ALAN KIP-NIS, PLAINTIFFS–RESPONDENTS, v. HARBORVIEW DEVEL-OPMENT CORP., DEFENDANT AND THIRD–PARTY PLAIN-TIFF, AND KURENS SOUTH INC., PHILIP KURENS AND CLAIRE KURENS, DEFENDANTS AND THIRD–PARTY PLAINTIFFS–APPELLANTS, v. ROBERT NOTTE, THIRD–PAR-TY DEFENDANT.

Argued January 3, 1996—Decided July 16, 1996.

*John Barry Cocoziello* argued the cause for appellants (*Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello,* attorneys; *H. Curtis Meanor* and *Mr. Cocoziello,* of counsel; *Amy B. Wagner,* on the briefs).

*Elliott Abrutyn* argued the cause for respondents (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski* and *Lum, Danzis, Drasco, Positan & Kleinberg,* attorneys; *Mr. Abrutyn* and *Dennis J. Drasco,* of counsel; *Warren Usdin* and *Kevin J. O'Connor,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the ancillary jurisdiction of the Chancery Division of Superior Court. The question is whether in a pending equitable action between business partners, the Chancery Division may retain jurisdiction over a compulsory counterclaim asserted by one group of partners against another group of partners for legal malpractice related to the partnership affairs. We hold, in the circumstances of this case, that the fiduciary relationship between the attorney-partner and the counterclaiming partner was sufficiently related to the equitable oversight of the partnership affairs to warrant the retention of jurisdiction of the counterclaim in the Chancery Division.

I

This action arose out of a failed real estate development project. We draw the facts primarily from the briefs of the defendants.

The project, known as "Marina Cove," called for 96 condominium units to be built in three phases in North Miami Beach, Florida. Initially, the project was formed as a joint venture between Harborview Development Corporation (Harborview), a real estate development corporation owned by third-party defendant Robert Notte, and Lyn–Anna Properties (Lyn–Anna), a limited partnership owned by plaintiffs Alan Husak and Alan Kipnis. The original financing for Marina Cove was obtained through Sunrise Savings & Loan, which became insolvent in 1986.

After Sunrise Savings failed, the venture was able to secure replacement financing from First American Savings. However, additional funds were needed to close the loan. For those funds, Notte turned to an acquaintance, defendant Philip Kurens. In December 1987, Kurens agreed to invest in Marina Cove in return for a share of its profits. He incorporated defendant Kurens South, Inc., and became a partner in Harborview. Kurens alleges that plaintiff Alan Kipnis acted as attorney for Harborview in that matter, and served as escrow agent for the receipt of Kurens' money.

Although the replacement loan eventually closed, the project continued to lose money. By the end of 1989, Marina Cove required another infusion of capital. Notte again turned to Kurens who agreed to invest additional funds in return for receiving all of the stock in Harborview. On December 12, 1989, Kurens and Harborview entered into an agreement that provided that in exchange for his investment Kurens would assume managerial control of Marina Cove and receive all of Notte's interest in Harborview. This left Lyn–Anna (Kipnis' group) as a partner with Kurens. After Kurens assumed control of Harborview, the project continued to lose money until it became apparent that it was doomed to failure.

On December 12, 1990, plaintiffs Husak, Kipnis and their partnership, Lyn–Anna Properties, brought suit in the Chancery Division, Essex County, seeking to restrain the disbursement of funds and to obtain an accounting of monies disbursed. Plaintiffs

alleged that Kurens' conduct after obtaining control of Harborview was in breach of the December 12, 1989, management agreement and that such breach led to the failure of the project.

Defendants Harborview, Kurens South, Philip Kurens and Claire Kurens filed a counterclaim against plaintiffs, also seeking to recover losses. However, their counterclaim focused on events that occurred between the fall of 1987 and December 12, 1989. Defendants alleged that Kipnis' conduct constituted legal malpractice and fraud. (For convenience, we sometimes refer to the defendants collectively as Kurens.) Kipnis and Husak demanded a trial by jury in their complaint. Defendants also demanded a jury trial. In 1992, plaintiffs waived their jury trial right. Presumably to confirm their continued right to a jury trial in the face of plaintiffs' waiver, defendants then made a motion for a jury trial, which was denied by the trial court in a letter opinion dated February 17, 1993. Following a bench trial, the Chancery Division dismissed both plaintiffs' complaint and defendants' counterclaim with prejudice.

Defendants appealed, arguing that the trial court erred in denying their request for a jury trial on their counterclaim against Kipnis. The Appellate Division affirmed for substantially the same reasons expressed in the trial court's letter opinion. The Appellate Division noted that the parties' claims arose out of and stemmed from the same transaction. Each of the claims relied in part on the parties' December 1987 agreement, and the disputed events all took place while that agreement was in effect. As a result, the court concluded that defendants' counterclaim was ancillary to the equitable claims raised by plaintiffs' complaint. Thus, the trial court properly applied the doctrine of ancillary jurisdiction that enables a court in equity to try without a jury those legal counterclaims that are ancillary or incidental to the equitable claims raised in plaintiffs' complaint.

We granted certification limited to the issue of whether the defendants are entitled to a jury trial on their counterclaims for malpractice and fraud. 142 *N.J.* 454, 663 *A.*2d 1361 (1995).

Defendants contend that those claims are temporally and factually distinct from plaintiffs' claims and, as such, are not ancillary or incidental to plaintiffs' claims.

## II

### A.

The problem is as old as the Republic. In his brief, defendant-counterclaimant argued that he was "entitled to a trial by jury under the 1776 constitution, the 1884 constitution, and the 1947 constitutions" of the State of New Jersey. When New Jersey declared its independence in 1776, it adopted as its law the common law of England. *N.J. Const. of 1776* ¶ XXII. The traditions of civil law generally received into the American Colonies included the twin features of the English system of laws—the right to trial by jury for an action at common law, and the right to an equitable action when a remedy of law might be inadequate.

Time does not permit an exhaustive study of the origins of equity jurisprudence.

> Both equity and the common law have roots in the early English legal system: the gradual assumption of judicial power over controversies by courts deriving their power from the King and his Council to the disposition of the various local courts. As King and Curia Regis [King's Council] assumed power to resolve more controversies, they had to delegate that power to more judicial officers. The judges of the King's Bench and Common Pleas became the common law courts. Others, such as the Courts of Admiralty and the Marches, applied separate bodies of law to the cases in their peculiar areas of jurisdiction. Initially all these royal courts were closely connected with the King personally and politically and were willing to be innovative and "equitable." Over time, however, the common law courts lost their close connection with the King and their willingness to be innovative or equitable.
>
> [Honorable H. Brent McKnight, *How Shall We Then Reason? The Historical Setting of Equity*, 45 *Mercer L.Rev.* 919, 926 (1994) (footnotes omitted).]

The early common law was closely tied to formal rules of pleading, and the ability to bring suit in the King's Court depended upon the availability of a "form of action," a writ, that would encompass a would-be plaintiff's claim. "As Professor Maitland put it in his famous commentary on the old system, 'the system of

forms of action ... is the most important characteristic of English medieval law.'" Ian Holloway, *Judicial Activism in an Historical Context: Of the Necessity for Discretion*, 24 *Mem. St. U.L.Rev.* 297, 307–08 (1994) (quoting F.W. Maitland, *The History of English Law Before the Time of Edward I* (1895)). "[A]s the common law became more formal, people began to seek and the system began to provide a less rigid means of redress. The common law system responded to the need for change, most notably developing a system of equity." *Id.* at 317. The Chancellor was encharged as early as 1468 A.D. to determine all matters according to equity and conscience. J.H. Baker, *An Introduction to English Legal History* 90 (2d ed. 1979) (quotation omitted). Because the Chancellor was unable to discharge all of his new duties individually, the Court of Chancery developed to grant special remedies that common law courts could not give.

> Thus it came about that ... we had alongside of the courts of common law, a court of equity, the Court of Chancery.... They are supplementing the meagre common law, they are enforcing duties which the common law does not enforce, e.g. they are enforcing those understandings known as uses or trusts, and they are giving remedies which the common law does not give, thus if a man will not fulfil his contract, all that a court of common law can do is to force him to pay damages for having broken it—but in some cases the Chancery will give the more appropriate remedy of compelling him ... to specifically perform his contract, to do exactly what he has promised.
>
> [F.W. Maitland, *The Constitutional History of England* 225–26 (H.A.L. Fisher ed. 1908).]

Forms of pleading were simplified and witnesses were compelled to give evidence under oath.

And so the equity courts developed as an alternative to the rigidity of the intricate procedural requirements of the law courts that often yielded unfair results. Cases were frequently dismissed for minor defects, such as technical errors in pleadings. The other feature of English common law that we accepted was that of trial by jury in law courts.

> Civil trial by jury is guaranteed [in the federal system] by the Seventh Amendment.... Not only has the right a long history, it was a theme of our struggle for independence. There are numerous works which recount the role the right to jury trial in civil cases has played in our history. It was perhaps the only right universally guaranteed by state constitutions prior to the revolution.... In

fact, the Seventh Amendment played a crucial role in ratification of the Constitution. This right, one of "deep interest and solicitude," is to be jealously guarded against encroachment.

[*In re Harbour*, 840 *F.*2d 1165, 1182 (4th Cir.1988) (Widener, J., dissenting) (footnotes and quotation omitted), *vacated*, 492 *U.S.* 913, 109 *S.Ct.* 3234, 106 *L.Ed.*2d 582 (1989).]

The constitutions adopted by the several states after the American Revolution included a specific recognition of the right of trial by jury. *See generally* J. Kendall Few, American Jury Trial Foundation, *In Defense of Trial by Jury* (1993). The right of trial by jury was among the limited guarantees of civil rights included in the New Jersey Constitution of 1776. *N.J. Const. of 1776* ¶ XXII. At the same time, in New Jersey, as in other states, a parallel system of equity jurisprudence existed. *See generally* Carla Vivian Bello & Arthur T. Vanderbilt II, The Institute for Continuing Legal Education, *Jersey Justice: Three Hundred Years of the New Jersey Judiciary* (1978).

The Judicial Article of the Constitution of the United States, adopted in 1787, made no reference to courts of law or equity. Congress, however, contemplated that federal courts would exercise equitable jurisdiction. The Judiciary Act of 1789, "by which the first Congress established the judicial courts of the United States and defined their jurisdiction, [provided] that 'Suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate, and complete remedy may be had at law.'" *Buzard v. Houston*, 119 *U.S.* 347, 351, 7 *S.Ct.* 249, 251, 30 *L.Ed.* 451, 453 (1886) (quoting Act of Sept. 24, 1789, ch. 20, § 16, 1 Stat. at L. 82; Rev.Stat. § 723). The Bill of Rights, when ratified in 1791, included the provision in the Seventh Amendment that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." *U.S. Const.* amend. VII.

## B.

Article I, paragraph 9 of the New Jersey Constitution of 1947 guarantees the right of trial by jury. "The right of trial by jury shall remain inviolate; but the Legislature may authorize the trial of civil causes by a jury of six persons when the matter in dispute does not exceed fifty dollars." *N.J. Const.* art. I, ¶ 9. Similar text was found in the Constitutions of 1844 and 1776. Generally speaking, the right to civil jury trial preserved in each of our constitutions has been the right to jury trial that existed theretofore. *See Shaner v. Horizon Bancorp.*, 116 *N.J.* 433, 447, 561 A.2d 1130 (1989) (detailing the historic links). For today's purposes we need go no further back than 1947 to ask whether a counter-claimant in a chancery action would have been entitled to trial by jury before 1947. *In re LiVolsi*, 85 *N.J.* 576, 587, 428 A.2d 1268 (1981).

At common law, it was understood that "[e]quitable actions as such are not within the constitutional provisions that the right of trial by jury shall remain inviolate, or that the right 'as heretofore enjoyed' shall be preserved." B.C. Ricketts, Annotation, *Right In Equity Suit To Jury Trial Of Counterclaim Involving Legal Issue*, 17 *A.L.R.*3d 1321, 1324 (1968).

In the first volume of reports that followed the adoption of the Constitution of 1947, this Court decided two cases that addressed the jurisdiction of the Chancery Division and that made clear that a court of equity may properly adjudicate an ancillary legal claim without providing the complainant with a jury trial. The first, *Ebling Brewing Co. v. Heirloom, Inc.*, 1 *N.J.* 71, 78–79, 61 A.2d 885 (1948), rejected defendant's argument that the Constitution required a jury trial of its legal counterclaims for breach of contract and federal price regulations and held that the Chancery Division could properly dispose of the legal counterclaims under the doctrine of ancillary equitable jurisdiction without impanelling a jury.

The second, *Fleischer v. James Drug Stores*, 1 *N.J.* 138, 62 A.2d 383 (1948), decided three weeks after *Ebling*, held that a plaintiff

who sought specific performance of a contract, as well as damages for conspiracy, breach of contract and tortious interference, was not entitled to a jury trial in the Chancery Division because the plaintiff's legal claims were ancillary to its equitable claims. Justice Heher, writing for the Court in *Fleischer*, explained the jurisdiction of the Chancery Division as follows:

> It is the settled rule that where equity has rightfully assumed jurisdiction over a cause for any purpose, it may retain the cause for all purposes, and proceed to a final determination of the entire controversy and, except where the jurisdiction of equity depends on the prior establishment of a right at law, settle purely legal rights and grant legal remedies. When the basis of the jurisdiction is once perceived, its scope and extent become readily apparent. The rationale of the rule that an equitable feature draws the cause completely within the cognizance of equity is the policy of avoiding a multiplicity of suits; and so jurisdiction of the whole controversy may be assumed for the doing of complete justice in the one suit. The constitutional right of trial by jury is, of course, subject to this inherent equitable jurisdiction. Equity has a general jurisdiction to adjudicate ancillary and incidental matters. This jurisdiction is co-extensive with the rights of the parties in the subject-matter of the suit. It may, in the exercise of a sound discretion, do whatever is necessary to a final adjudication of the entire controversy between the parties, whether it encompasses an action *ex delicto* or one *ex contractu*. And it may grant relief to a defendant or between codefendants. It suffices if the matters to be adjudicated be germane to or grow out of the subject-matter of the equitable jurisdiction.

[*Id.* at 150, 62 *A*.2d 383 (citations omitted).]

In *Steiner v. Stein*, 2 *N.J.* 367, 66 *A*.2d 719 (1949), the Court applied the *Fleischer* and *Ebling* principles in circumstances that were a near-mirror image of the issues in this case. Plaintiff-client in *Steiner* sought the aid of equity to obtain the release of files held by an attorney under a lien claim. The attorney counterclaimed for his legal fees and demanded a jury trial. The Court denied the attorney a right to trial by jury on the counter-claim, observing that even though the attorney had released the file (the clients having posted a bond), the "matters ... were properly, although not exclusively, within the competence of the Court of Chancery.... It [thus] follows that under our former practice [before the 1947 Constitution] all the issues in this case would have been disposed of in the Court of Chancery without any right of trial by jury." *Id.* at 376, 66 *A*.2d 719 (citations omitted).

The justices who decided *Steiner, Fleischer* and *Ebling* had closely observed the development of the Constitution of 1947. Justice Clarence Case, the author of *Ebling*, was a witness at the Convention. Justice Dayton Oliphant had been Chancellor prior to 1947 and was also a witness at the convention. The author of *Steiner*, Chief Justice Arthur T. Vanderbilt, contributed to the development of the Judicial Article of the new Constitution. Successor courts have followed *Steiner's* analysis. In *In re LiVolsi, supra*, the Court applied a similar reasoning process to determine whether a cause of action existed at common law in a form that involved the right to trial by jury. *LiVolsi* involved the validity of the use of arbitration committees to settle, without a jury trial, fee disputes between attorneys and clients. The Court observed that the *Steiner* Court rejected a characterization of the action against the attorney simply as contractual and instead focused on the presence of the fiduciary relationship between attorney and client to find that the lower court would be employing primarily equitable remedies. *LiVolsi, supra*, 85 *N.J.* at 587–88, 428 *A.*2d 1268.

Thus, the *LiVolsi* Court found that arbitration of attorney-client fee disputes did not transgress the Constitution because the issues inherent in remedying a breach of the attorney-client relationship, such as the reasonableness of fees, existence of a confidential relationship, and the superior position of the attorney, all implicate equitable concerns and not the right to trial by jury.[1] *Id.* at 588–90, 428 *A.*2d 1268.

Such has been the consistent understanding of our constitutional article. In *Boardwalk Properties v. BPHC Acquisition, Inc.*, 253 *N.J.Super.* 515, 530, 602 *A.*2d 733 (App.Div.1991), the parties removed all equitable claims from their case in Chancery, leaving predominantly legal claims in connection with a failed real estate transaction, in order to secure a jury trial on those legal claims. Notwithstanding those strategic procedural maneuverings, the

---

[1] The Court also found authority to provide for arbitration in its exclusive power to regulate the practice of law. *LiVolsi*, 85 *N.J.* at 590–91, 428 *A.*2d 1268.

Appellate Division affirmed the trial court's determination that the parties had no right to a jury trial on the remaining legal issues. The court declared that "[i]t was clear prior to the 1947 constitution that ... if the primary relief sought by the complainant was equitable in nature, equity had jurisdiction to settle all issues, even though purely legal in nature, where subsequent events made it impractical or unnecessary to award equitable relief." *Id.* at 527, 602 *A.*2d 733.

In *Eckerd Drugs of New Jersey v. S.R. 215, Rite–Aid Corp.*, 170 *N.J.Super.* 37, 405 *A.*2d 474 (1979), the Chancery Division denied plaintiff a jury trial on its claims for tortious interference with either contract or prospective economic advantage and for damages relating to that interference on the ground that the case was fundamentally equitable in nature. The court noted that the legal issues were "almost indistinguishable" from the equitable ones, declaring that "[defendant's] tortious conduct is ancillary, if not incidental, and the legal remedies demanded are definitely incidental to the equitable demands. Plaintiff has no right to a trial by jury in this case...." *Id.* at 42–43, 405 *A.*2d 474.

In *Apollo v. Kim Anh Pham*, 192 *N.J.Super.* 427, 470 *A.*2d 934 (1983), the chancery court found that defendant-counterclaimant's equitable claims, which were based on theories of *quantum meruit* and quasi-contract, "involve[d] substantially similar factual issues to those raised in her legal [palimony] claim." *Id.* at 432, 470 *A.*2d 934. Accordingly, the court denied defendant's motion for a jury trial on the grounds that defendant's palimony claim was "sufficiently intertwined with and ancillary to the equitable issues" as to be within chancery's equitable jurisdiction. *Ibid.*

Counterclaimant, however, urges that we follow federal precedent, which has required trial by jury in the context of compulsory counterclaims, rather than our own. In *Beacon Theatres, Inc. v. Westover*, 359 *U.S.* 500, 508–09, 79 *S.Ct.* 948, 955–56, 3 *L.Ed.*2d 988 (1959), when defendant asserted an anti-trust counterclaim against a theater chain, the Court held that when legal and equitable issues are presented in a single case the right to jury trial on the

legal issues remains intact. The Court determined that the traditional "justification[s] for equity's deciding legal issues once it obtains jurisdiction, and refusing to dismiss a case, merely because subsequently a legal remedy becomes available [had to be] re-evaluated in the light of the liberal joinder provisions of the Federal Rules which allow legal and equitable causes to be brought and resolved in one civil action." *Id.* at 509, 79 *S.Ct.* at 956, 3 *L.Ed.*2d at 996–97. The *Beacon* Court's holding "applies whether the trial judge chooses to characterize the legal issues presented as 'incidental' to equitable issues or not." *Dairy Queen, Inc. v. Wood,* 369 *U.S.* 469, 473, 82 *S.Ct.* 894, 897, 8 *L.Ed.*2d 44, 48 (1962).

Acknowledging that under the incidental legal claims doctrine, "the right to trial by jury may be lost as to legal issues where those issues are characterized as 'incidental' to equitable issues," the *Dairy Queen* Court explicitly declared that "no such rule may be applied in the federal courts." *Id.* at 470, 82 *S.Ct.* at 896, 8 *L.Ed.*2d at 47; *see Thermo–Stitch, Inc. v. Chemi–Cord Processing Corp.,* 294 *F.*2d 486, 491 (5th Cir.1961) ("It is therefore immaterial that the case at bar contains a stronger basis for equitable relief than was present in *Beacon Theatres.* It would make no difference if the equitable cause clearly outweighed the legal cause so that the basic issue of the case taken as a whole is equitable. As long as any legal cause is involved the jury rights it creates control. This is the teaching of *Beacon Theatres,* as we construe it.").

Other jurisdictions have followed *Beacon Theatres* and *Dairy Queen. See, e.g., Harada v. Burns,* 50 *Haw.* 528, 445 *P.*2d 376, 382 (1968) (relying on *Beacon Theatres* to conclude that mortgagors were entitled to jury determination of legal issues raised by counterclaim interposed in equity suit even though counterclaim was permissive); *Norwest Bank Wisconsin Eau Claire, N.A. v. Plourde,* 185 *Wis.*2d 377, 518 *N.W.*2d 265, 268 (App.1994) (holding that mortgagors asserting legal counterclaim in equitable fore-closure action did not waive their right to jury trial).

New Jersey's legal history and traditions, however, have placed a greater emphasis on the distinct roles of its law and chancery courts. Bruce D. Greenberg & Gary K. Wolinetz, *The Right To A Civil Jury Trial In New Jersey,* 47 *Rutgers L.Rev.* 1461, 1472 (1995) ("[T]he traditional distinction between law and equity remains vital in determining the right to a jury trial in New Jersey.").

Among the principal points of debate in the development of the Judicial Article for the Constitution of 1947 was the role of chancery. A recent law review interview contains the recollections of one of the principal actors in that debate. *See generally Conversations With Morris Schnitzer,* 47 *Rutgers L.Rev.* 1391 (1995) [hereinafter *Conversations*]. Roscoe Pound, the former Dean of the Harvard Law School and Commissioner of the Supreme Court of Nebraska, explained the choice that the Constitutional Convention of 1947 faced.

> The thing that I suppose will give you most trouble in New Jersey, the thing that is perhaps most necessary to speak about, is this matter of a separate Court of Chancery. I taught equity for a great many years, and the *New Jersey Equity Reports* were a joy forever to a teacher of equity. *Johnson's Chancery,* of New York, and the *New Jersey Equity Reports* were the reports to which a teacher of equity has always turned. I should feel very badly if I thought that any judicial organization which you might work out here would result in any diminution of that splendid development of equity that is going on here, because after all, equity is the most important part of the Anglo–American system of administering justice. It is increasingly important today; but after all, I don't believe it is necessary to have a separate, independent court of equity to achieve that. It is not only possible, but I think it is necessary in any unified judicial organization, to permit of divisions in the courts.
>
> [IV *Proceedings of the New Jersey Constitutional Convention of 1947* 107 [hereinafter *Proceedings*].]

Leading members of the bar and of the public had urged the Committee on the Judiciary not to abolish the Court of Chancery as a separate tribunal with judges devoting themselves to equity jurisprudence. Milton Conford was principal spokesman for the viewpoint of those who would maintain a separate tribunal. Judge John Biggs of the United States Court of Appeals for the Third Circuit encouraged the Committee to retain its separate Court of Chancery. In a letter he wrote: "The Court of Chancery of New

Jersey enjoys universal esteem. There has been a succession of great Chancellors in New Jersey. They have made much sound law. . . . As one who is bound by the decisions of the New Jersey courts I am very loath to see New Jersey's separate Chancery Court abolished." *Id.* at 407. A. Dayton Oliphant, Chancellor of New Jersey, had testified in favor of retention of the Court of Chancery and acknowledged the difficult decisions that arise when equitable causes are joined with legal causes. *Id.* at 404.

At the same time, prominent practitioners decried the problems that plagued the existing system. The problems arose from the fact that those were separate courts with separate jurisdiction. Although the jurisdictional pitfalls may have been exaggerated, the practical men and women who framed the Judicial Article of the 1947 Constitution were determined to eliminate them.[2] In doing so, they considered many of the issues that we face today. Russell E. Watson, Counsel to then-Governor Driscoll, explained that "after all is said and done, these important questions [concerning the role of chancery] will be decided in the light of New Jersey experience, New Jersey tradition, New Jersey geography, and New Jersey needs." *Id.* at 162.

A member of the Committee asked Mr. Watson, "However, you are setting this thing up so that on cases that have some law and a lot of equity, or a lot of law and a little equity, still goes through one court?" To which Mr. Watson replied: "Exactly—where one judge has to decide the whole thing." *Ibid.*

Judge William Smith, United States District Judge for the District of New Jersey, explained to the Committee what could be expected if the courts were part of the same system:

[The equity court] having taken jurisdiction of the matter because of [its] equity powers . . . retains jurisdiction to assess the damage and the trial by jury becomes unnecessary. There the judge entertains his traditional equity power; having

---

[2] More mundane considerations, such as patronage, may also have marked the cloakroom debates about the role of chancery. *See Conversations, supra,* 47 *Rutgers L.Rev.* at 1395–96.

acquired jurisdiction of such a matter for equitable purposes, he retains it to do complete justice.

[*Id.* at 327.]

The Committee resolved to preserve the best of both the features.[3]

And so it was that the final report of the Committee on the Judiciary proposed a single "Superior Court which ... will have a Law Division and Chancery Division, exercising original general jurisdiction in all causes throughout the State." II *Proceedings, supra,* at 1187. It was expected that "[u]ndoubtedly, Judges [would] be assigned to each branch by the Chief Justice of the Supreme Court according to experience and qualifications.... However, each controversy [would] be decided fully in all its aspects by the Judge before whom it c[ame], and no case [would] be shuttled between courts for piecemeal decision." *Ibid.* The Committee recognized that there would be circumstances in which juries could be impanelled in the Court of Chancery, observing that during a recent wave of strikes Vice Chancellors had summoned juries to try persons charged with disobeying court orders. *Id.* at 1188.

▆ The Judicial Article of the 1947 Constitution "was not intended as a grant, enlargement or restriction of the right of trial by jury." *Kugler v. Banner Pontiac–Buick, Opel, Inc.,* 120 *N.J.Super.* 572, 581, 295 *A.*2d 385 (Ch.Div.1972). A dominant theme of the Constitution of 1947 was the development of a court system that would meet the needs of New Jersey's rapidly changing society after World War II. Just as equity courts originally evolved to meet the changing needs of society, so their current mode conforms to the changing needs of society. Governor Alfred E. Driscoll, a great contributor to the Judicial Article of the 1947

---

[3] William J. Brennan, Jr., then a New Jersey lawyer, expressed the sentiment of the editors of the New Jersey Law Journal that "emotions and prejudices aside, there is no real reason for the perpetuation of [chancery's] individuality [as a separate, independent tribunal]. In a modern judicial system, where the objective is to provide for full, adequate and expeditious justice for all litigants, its jurisdictional idiosyncrasies and limitations should be ended." *Id.* at 203.

Constitution, explained that "more mature students of government and citizens generally recognize that more basic issues are involved [than a jurisdictional dispute], including respect for the law, the republic, as well as, although frequently overlooked, the rights of litigants to a speedy, inexpensive, authoritative decision on disputed issues." IV *Proceedings, supra,* at 433.

We are urged now to curtail our precedents because of the evolving importance of the entire controversy doctrine and the present formulation of *Rule* 4:7-1 dealing with compulsory counterclaims. It is not so much that the entire controversy doctrine is new as that the doctrine of ancillary jurisdiction is old. In some ways, they are two sides of the same coin. See *Central Penn National Bank v. Stonebridge Ltd.,* 185 *N.J.Super.* 289, 448 *A.*2d 498 (Ch.Div.1982), in which the court observed:

> [t]he single controversy doctrine may also be justified on the equitable doctrine that once a case is properly brought in the Chancery Division, it should remain there for final resolution even after the disposition of the equitable issues. The rationale for retaining jurisdiction is the equitable principle requiring full adjudication of even legal issues, and the mandate of Article VI of the 1947 Constitution prohibit[ing] the fragmentation of litigation.
>
> [*Id.* at 312, 448 *A.*2d 498 (citing *Steiner, supra,* 2 *N.J.* at 373, 66 *A.*2d 719).]

In *Middlesex Concrete Products & Excavating Corp. v. Northern States Improvement Co.,* 129 *N.J.Eq.* 314, 19 *A.*2d 48 (E. & A.1941), decided a short time before the 1947 Constitution was debated, the Court of Errors and Appeals upheld the validity of a statute vesting jurisdiction in the Chancery Court to determine sums due on various lien claims on the basis that the jurisdictional grant was "merely an adaptation of the stated principle, grounded in the policy of avoiding a multiplicity of suits, that, if equity has rightfully assumed jurisdiction of a cause on any ground, it may ordinarily proceed to a determination of the entire controversy." *Id.* at 317, 19 *A.*2d 48.

Of course the jurisdiction of a chancery court is to be exercised with a sensitive regard for the right to trial by jury. It is not an "inflexible rule" that chancery, having once acquired jurisdiction, should retain the case "to settle all the rights of all

the parties...." *Shaw v. G.B. Beaumont Co.,* 88 *N.J.Eq.* 333, 336, 102 *A.* 151 (E. & A.1917). The *Shaw* court quoted Chief Justice Mercer Beasley: "It is not true, by any means, that when a court of conscience has acquired cognizance for one purpose, it thereby acquires cognizance over the entire controversy for all purposes." *Ibid.* (quoting *Loder v. McGovern,* 48 *N.J.Eq.* 275, 22 *A.* 199 (E. & A. 1891)). Each case requires a measure of the nature and relationship of the issues and claims and the extent to which decision of the legal issues "is incidental or essential to the determination of some equitable question." *Ibid.* (quoting Vice Chancellor Reed in *Stout v. Phoenix Assurance Co. of London,* 65 *N.J.Eq.* 566, 573–74, 56 *A.* 691 (Ch.Div.1904)). Thus, in *Chiacchio v. Chiacchio,* 198 *N.J.Super.* 1, 9, 486 *A.*2d 335 (App.Div.1984), the court transferred to the Law Division for jury trial a dispute over coverage between a marital tortfeasor and his insurance company. That dispute was neither incidental nor essential to the underlying marital dispute.

Contrary to defendants' assertion that *New Jersey Highway Authority v. Renner,* 18 *N.J.* 485, 114 *A.*2d 555 (1955), establishes the right to trial by jury on a compulsory counterclaim, that case actually holds that "under the particular circumstances [there] presented" when "[f]rom the start the parties proceeded on the basis that the issue raised in the counterclaim was not merely incidental to the equitable cause of action, but was an independent cause of action [that would be] tr[ied] by jury [after the equitable claims were resolved]" the Chancery Court should not have denied the defendant her right to a jury trial on her legal counterclaim at the end of the equitable action. *Id.* at 494–95, 114 *A.*2d 555. Justice Jacobs, the author of *Renner* and former Vice–Chair and principal architect of the Judicial Article of the 1947 Constitution, noted in that decision that had the parties not presented the issues in an untimely and improper manner, *Renner* would have been an entirely different case. *Id.* at 495, 114 *A.*2d 555. Likewise, in this case, as counsel acknowledge, had Kipnis first brought his action at law demanding a jury trial, the focus of the case might have

been different. But as it developed the initial core of the controversy centered on the fiduciary relationship among the parties.

In assessing whether jury trial rights are infringed, courts should "consider the nature of the underlying controversy as well as the remedial relief sought. . . ." *Shaner, supra,* 116 *N.J.* at 450–51, 561 *A.*2d 1130. In this case, although the claims for relief were ultimately limited to money damages, entitlement to relief arose from the fiduciary relationship between and among the parties. Kipnis' duty as an attorney could not be fully divorced from his duty as a prospective partner. So too, Kurens' duties under the contract grew out of his partnership relationship with Kipnis and Husak. The subsequent conduct of Kurens as partner cannot realistically be divorced from the inception of his role in 1987 as a prospective partner of Kipnis and Husak or the expansion of that role in 1989. Notte, the intermediary between Lyn–Anna and Kurens, was the lead-off witness at the trial. Notte invited Kurens to invest in the project after meeting Kurens while Kurens was temporarily employed as a member of Notte's office staff in New Jersey. The records of the venture were maintained in Notte's office in New Jersey and at the construction site in Florida. The court found that Kipnis did not have access to Harborview's books and records to see how Notte's 1989 contribution (of loan or capital) was treated. Notte testified that Kipnis always represented himself as an investor in Harborview, although he acknowledged that his firm did legal work for the venture. Kipnis described himself as one who primarily dealt with lien creditors, the trades that had provided labor or materials to the job. He did close the 1987 mortgage and agreed to act as escrow agent for Kurens' interests. In its ultimate findings of fact, the Chancery Division observed that when Kurens increased his stake in the venture in 1989, he was aware of one of his claims of Kipnis' alleged ethical misconduct in 1987. Kurens had full access to the records that disclosed how the 1987 escrow funds had been handled. In short, there is no clear cut line of demarcation between the attorney malpractice issues and the partnership

management issues. The issues are part of the broader fiduciary relationship among the joint venturers in the Harborview project. The Chancery Division correctly held that

the claims made by the defendants on the actions of Kipnis are so interrelated with the equitable issues in this matter that they are properly deemed ancillary. Plaintiffs have asserted that defendants breached their fiduciary duties and mismanaged this project. Defendants have raised as an equitable defense the conduct of the plaintiffs in first inducing them into this project and then encouraging defendants to take an even greater stake in it. Those issues are subject to the general jurisdiction of this court to consider and dispose of ancillary legal issues without a jury.

We are thus satisfied that the Chancery Division appropriately exercised its jurisdiction to "settle all the rights of all the parties," *Shaw v. Beaumont, supra,* 88 *N.J.Eq.* at 336, 102 *A.* 151. That the modern form of *Rule* 4:7–1 (incorporating the duty to assert as a counterclaim all matters arising out of the transactions) made Kurens' counterclaim a compulsory counterclaim does not alter the original jurisdiction of Chancery. Even in the absence of *Rule* 4:7–1, principles of collateral estoppel would almost certainly have compelled Kurens to raise or lose the issue of Kipnis' misconduct. Maryland has adopted the federal rule of *Beacon Theatres* despite the fact that it does not have a comparable compulsory counterclaim rule precisely because of the analogy between the principles of *res judicata* and a compulsory counterclaim rule. *Higgins v. Barnes,* 310 *Md.* 532, 530 *A.2d* 724, 732 (1987). In contrast, we have long recognized the jurisdiction of chancery to resolve counterclaims even when assertion of the counterclaim was virtually compelled. *Middlesex Concrete Products, supra,* 129 *N.J.Eq.* at 316, 19 *A.2d* 48.

The right of trial by jury is an ever-present reminder of our belief in the importance of the individual. Then Justice Rehnquist expressed it well: "The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary." *Parklane Hosiery Co. v. Shore,* 439 *U.S.* 322, 343, 99 *S.Ct.* 645, 657, 58 *L.Ed.*2d 552, 570 (1979) (Rehnquist, J., dissent-

ing). Those important values have always been balanced in both state and federal systems with a concern for the traditional role of equity jurisprudence to provide a remedy when the ordinary civil suit for damages is inadequate and to provide a complete remedy when ancillary legal issues are presented. The nearly fifty years of experience since the adoption of the Constitution of 1947 convince us that the historic doctrine has been working well and that this discretionary jurisdiction can continue to be reposed in our chancellors. Those "courts of conscience," *Shaw, supra,* 88 *N.J.Eq.* at 336, 102 *A.* 151, guard at once the right to trial by jury and the right to an equitable action when a remedy at law might be inadequate.

In *Brennan v. Orban,* 145 *N.J.* 282, 678 *A.*2d 667 (1996), also decided today, we hold that, because of the divisibility of claims, the public interest in vindicating the policy against domestic violence outweighs in significance the competing State policies that favor resolution in a single proceeding of all family matters in dispute. In such a case, the court should, in the interests of justice, exercise its discretion to afford a jury trial to the victim of a marital tort.

To repeat Justice Jacobs' words, "justice is the polestar and our procedures must ever be moulded and applied with that in mind." *Renner, supra,* 18 *N.J.* at 495, 114 *A.*2d 555. In this case the paramount values of the Judicial Article that there be "full, adequate and expeditious justice for all litigants," IV *Proceedings, supra,* at 203 (statement of William J. Brennan, Jr.), are better served by recognizing the authority of the Chancery Division to resolve "all controversies brought before it." *Boardwalk Properties, supra,* 253 *N.J.Super.* at 526, 602 *A.*2d 733.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.