922 A.2d 782 (2007)
393 N.J. Super. 55
SUN COAST MERCHANDISE CORPORATION, a California corporation, and J.M. Wechter & Associates, Inc., a Connecticut corporation, Plaintiffs-Respondents/Cross-Appellants,
v.
MYRON CORPORATION, a New Jersey corporation, and Myron Manufacturing Corporation, a New Jersey corporation, Defendants-Appellants/Cross-Respondents.
Sun Coast Merchandise Corporation, a California corporation, and J.M. Wechter & Associates, Inc., a Connecticut corporation, Plaintiffs-Appellants,
v.
Myron Corporation, a New Jersey corporation, and Myron Manufacturing Corporation, a New Jersey corporation, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 6, 2006.
Decided May 15, 2007.
*784 Michael S. Stein, Hackensack, argued the cause for appellants/cross-respondents in A-6148-03T5 (Cole, Schotz, Meisel, Forman & Leonard, and Pashman Stein, attorneys; Thomas J. LaConte and Mr. Stein, on the brief).
Surjit P. Soni (The Soni Law Firm), Pasadena, CA, of the California bar, admitted pro hac vice, argued the cause for *785 respondents/cross-appellants in A-6148-04T5 and appellants in A-2965-04T5 (Ascione & Wilson, attorneys; Mr. Soni, of counsel; Janyce M. Wilson, on the briefs).
David M. Kohane, Hackensack, argued the cause for respondents in A-2965-04T5 (Cole, Schotz, Meisel, Forman & Leonard, attorneys; Mr. Kohane, on the brief).
Before Judges PARKER, C.S. FISHER and YANNOTTI.
The opinion of the court was delivered by
FISHER, J.A.D.
Following a thirteen-day jury trial, judgment was entered in the amount of $2,792,603.32, which included $700,000 in punitive damages, in favor of plaintiffs Sun Coast Merchandise Corporation and J.M. Wechter & Associates, Inc., the alleged sellers of certain goods. In this appeal, defendants Myron Corporation and Myron Manufacturing Corporation, the alleged buyers, contend that a number of issues  including whether a binding contract was formed  should have been resolved in their favor as a matter of law, and also that even if there were factual issues to be resolved by the jury, the trial judge failed to provide adequate jury instructions. Although we reject the contention that the chief issues in this case could have been resolved as a matter of law in this factually convoluted matter, we agree that the judge's jury instructions were inadequate, and, thus, reverse and remand for a new trial.

I
Plaintiff Sun Coast Merchandise Corporation, a California corporation, is in the business of designing various products, which are manufactured in factories in China, and sold to entities who then offer them as promotional items or gifts to clients or potential clients. Plaintiff J.M. Wechter & Associates, Inc., a Connecticut corporation, is one of Sun Coast's largest distributors. Wechter's involvement included the identification of potential clients in the marketplace and relaying their needs to Sun Coast, which then attempted to design and create the product.
Defendants Myron Corporation and Myron Manufacturing Corporation, both New Jersey corporations, are engaged in the business of marketing such products to small and medium-sized companies through the internet and by sampling programs, which involved sending small samplings of personalized products to potential customers.
The claims asserted by Sun Coast and Wechter (hereafter often collectively referred to as "sellers") against the Myron corporations (hereafter "Myron") largely revolve around the submission by Myron of purchase orders to the sellers for small calculators with flip-tops. Myron's intention was to engrave the names of its customers on the calculators so that the customers could distribute them as gifts to their clients. At a meeting on June 15, 2000, Myron indicated to sellers its interest in a flip-top calculator if it could be produced in a small enough size to fit into its mailings and at the right price.

A. Version I Calculators

In pursuing these intentions, Myron first entered into a series of transactions regarding what the parties have referred to as the "Version I calculators." Between December 2000 and May 2001, Myron purchased nearly 400,000 Version I calculators. With the exception of a May 8, 2001 order for 100,000 calculators, there were no disputes regarding Myron's other purchases of Version I calculators.
*786 Myron received the goods referred to in the May 8, 2001 purchase order but withheld payment, contending that the sellers breached the warranty against infringement, N.J.S.A. 12A:2-312(3), and also that it was entitled to withhold payment as an offset against damages it claimed to have suffered as a consequence of the sellers' actions regarding the Version II calculators.
Evidence was adduced during the trial that, on January 23, 2001, the United States Patent and Trademark Office granted a patent to CCL Products Enterprises, Inc. (CCL), a Sun Coast competitor, for a flip-top calculator similar to the Version I calculator. Sun Coast learned about this a few days after the patent was granted, when CCL representatives approached a Sun Coast representative at a trade show and asserted that the "flipping mechanism" on the Version I calculators infringed on CCL's patent. The next day, Sun Coast sued CCL in the United States District Court for the Central District of California, seeking a declaratory judgment that the Version I calculators did not infringe and that CCL's patent was invalid.
Within a day or so of issuing the February 12, 2001 purchase order for 70,000 Version I calculators, sellers informed Myron of CCL's patent infringement claim. According to Myron, sellers advised that they could nevertheless continue to sell the Version I calculators, but would have to pay a "royalty," which would cause an increase in the purchase price by six cents per calculator. Myron contended at trial and provided evidence to suggest that this additional payment was a "royalty." Sellers disputed this, providing testimony that it only advised Myron that this "upcharge" represented a payment toward "potential royalties" and litigation costs regarding the suit with CCL, and that such a charge was not unusual in this industry.
Myron claimed that it understood from these communications that the patent problem regarding the calculators would be "resolved" with this additional payment per calculator and, therefore, agreed to the upcharge. A revised purchase order regarding the February 12, 2001 purchase was sent by Myron to sellers on March 2, 2001.
On May 23, 2001, Myron representatives attended a trade show in New York City. At that time they spoke with the president of CCL, who said he had heard Myron was selling flip-top calculators and warned Myron to be careful because CCL was suing all those who violated its patent. According to Myron, these discussions generated concern about whether sellers were authorized to sell the Version I calculators.
An e-mail sent from sellers to Myron on June 1, 2001 provided an explanation for what Myron claims was represented as a "royalty," and for what sellers claim was represented as a cost toward "potential royalties" and litigation expenses in the CCL lawsuit:
When we first sold this calculator . . . your cost was $.60 cents F.O.B. [Hong Kong]. Then what happened is that someone (not us) was issued a patent on the flipping device. We then had to increase the unit by 10% (making it $.66 cents each) so that there were royalties built in to each calculator. At that point, [we] began to design, and patent, [our] own flipping mechanism. That is why, with the new molds being made for your larger quantities, your cost is down to $.57 cents F.O.B. [Hong Kong].
Myron also provided testimony that it received confirmation from CCL through a telephone conversation on June 4, 2001 that sellers were not authorized by CCL to sell the Version I calculators and should not have been charging a "royalty." As indicated, sellers provided competing evidence *787 that this upcharge was only for "potential royalties" and litigation costs in defending the product, and that Myron should have understood that it was not a royalty per se because of the pending lawsuit, of which Myron was aware. The jury resolved this dispute by concluding that sellers had negligently misrepresented that the 10% upcharge on the Version I calculators was a "royalty" payment when in fact it was not.

B. Version II Calculators

As the patent infringement issues arose during the final purchases of Version I calculators, sellers agreed to attempt a redesign, leading to the creation of what the parties have referred to as the Version II calculators. Prior to the issuance of any purchase order for Version II calculators, Sun Coast represented to Myron that the goods "would not infringe the CCL patent."
In March or April 2001, Myron indicated its desire to purchase a very large quantity of Version II calculators. The sellers offered a discounted price of $.57 per unit, three cents less than that paid for Version I calculators before the "royalty/potential royalty" upcharge was added. By April 22, 2001, Sun Coast had completed its redesign work for the Version II calculators, and representatives of the parties met in Hong Kong on either April 24 or 25, 2001. Sellers claimed at trial that Myron was then provided with a sample of the Version II calculator; Myron disputed this, providing evidence and arguing that it did not receive a sample until June 1, 2001.
In either event, on April 25, 2001, Myron issued a purchase order for 1,216,000 Version II calculators, providing both shipping dates and delivery dates. Sellers sent an e-mail on April 30, 2001, which approved a delivery schedule compatible with the schedule contained in the first purchase order.
In early May, Myron communicated its intent to make an even larger purchase, requiring the production of a total of 4,000,000 Version II calculators. A Myron representative sent an e-mail to sellers on May 7, 2001, questioning whether 4,000,000 calculators could be manufactured and shipped by November 1, 2001:
We are now trying to work out a schedule to deliver [4,000,000] units by the first of December. . . . [We] had a conference call and looked at the current schedule based on [2,200,000]. We pretty much figured out that with adding the [sixth] mold, we could deliver [3,000,000] units in time (confirming everything this week). My question is if we add a [seventh] and possibly an [eighth mold]  can the factory get to the [4,000,000] pieces  shipping by November 1?
Sellers responded by e-mail on May 8, 2001 with a revised delivery schedule, which would bring the last shipment of Version II calculators "in by mid-December."[1] Sellers also emphasized that the schedule was "based on confirming everything by this Thursday, May 10th." Myron expressed its satisfaction with this schedule on May 8, 2001.
By the time of the early May discussions regarding the delivery of the last of the 4,000,000 units by mid-December, Myron had not yet issued its second, third and fourth purchase orders, and the only extant purchase order was the initial April 25, 2001 order for 1,216,000 units. On May 16, 2001, sellers sent an e-mail advising that "if an order is confirmed today, the factory has stated that they can manufacture [4,000,000] units based on the schedule" provided on May 8, 2001; Myron *788 responded that it was in the process of revising its purchase orders to conform to that schedule.
The second, third and fourth purchase orders bear the date May 17, 2001; the second purchase order, for 1,000,000 calculators, was faxed to sellers on May 18. By Monday, May 21, 2001, Myron still had not delivered its third and fourth purchase orders; instead, an e-mail to sellers indicated that on that day and the next, Myron would be "inputting those final numbers into the system." Myron also then indicated that the third and fourth purchase orders "are printed and awaiting authorization," which was expected to occur on Wednesday, May 23, 2001. Notwithstanding that Myron had not delivered the third and fourth purchase orders for the last 1,750,000, this May 21, 2001 e-mail requested that sellers "not stop the making of the molds" for the 4,000,000 units and that, "[i]f necessary," Myron would "put in writing that we will be responsible for the molds, if we do not indeed order the 4,000,000." Sun Coast's chief operating officer testified that he agreed to Myron's May 21, 2001 request and that he informed his supplier to continue with the manufacturing of the molds.[2] Despite the indication in the May 21 e-mail that authorization for the issuance of the third and fourth purchase orders was expected by Wednesday, May 23, the purchase orders were not issued until Friday, May 25, 2001.[3]
On May 29, 2001, two business days after receiving the third and fourth purchase orders, sellers e-mailed to Myron a revised delivery schedule, which called for delays in the original schedule anywhere from seven to twenty-eight days from what was originally indicated. As a result, the last delivery date contained in the May 8 schedule, i.e., November 11, 2001, would not, according to the May 29 schedule, occur until December 9, 2001. In this e-mail, sellers requested that Myron forward "revised purchase orders reflecting" these new shipping dates.
Either that day or the next, Myron advised sellers that it would be reducing its order from 4,000,000 to 3,500,000 Version II calculators. By way of an e-mail on May 31, 2001, which incorporated a letter dated June 1, 2001, sellers provided a revised shipping schedule, which reflected the elimination of the final 500,000 calculators. Therein, sellers also stated:
We can proceed with the current order under condition that you sign the revised delivery schedule that I have attached and fax it to me. Please understand that your purchase order reflects dates that the factory cannot meet. If I accept this order as is, I am obligated by this contract to deliver based upon what is printed. . . . Please sign and fax the attached revised schedule to me today so that I can give the factory the go ahead to proceed with this order.
Following this, e-mails were exchanged on June 1, 2001. A Sun Coast representative indicated that day that Myron should have received "the new samples of the calculator" that morning, and expressed a "need [for] your approval of the calculator today and the revised schedule signed and returned today in order to meet the schedule submitted earlier this week." He further indicated that "the factory is ready to *789 start producing tomorrow" and that "[i]f everything is not confirmed by today, all schedules will change." In response, a Myron representative advised that the samples had been received and were "given . . . to the appropriate people here to evaluate," but that, "[a]t this time, I cannot sign the revised schedule letter" because certain Myron representatives were not then available to make that ultimate decision.
There was also testimony from Sun Coast's chief operating officer that a Myron representative expressed concern that the Version II calculators might infringe the CCL patent. In addition, the record reveals that Myron provided the samples to its attorney, who immediately opined that the flip-top mechanism might infringe the CCL patent.
On June 4, 2001, Myron communicated with CCL to determine whether CCL might be interested in supplying calculators; CCL declined and again stated that sellers were not authorized to sell Version I calculators. Testimony suggested that Myron then arranged for a conference with sellers' representatives because of its concerns about the modification of the delivery schedule and the patent infringement issue.
At meetings over the course of June 5 and 6, 2001, Myron indicated its continued desire to purchase calculators but was concerned that the Version II calculators infringed the CCL patent and indicated that it was not willing to purchase Version II calculators unless they could be redesigned. Sellers agreed to attempt a redesign but ultimately concluded that its efforts were unsuccessful, and, on June 14, proposed that Myron either: accept "the spring mechanism as per the sample sent to you over the last two days," or "wait for additional samples with a new spring mechanism," even though "as advised there will not be much difference," or "go back" to the samples provided on June 1 and consider getting a second opinion from another attorney regarding Myron's infringement concerns.
On June 15, 2001, Myron suggested that it might be willing to proceed with the transaction if sellers provided an acceptable indemnification agreement buttressed by a standby letter of credit to protect Myron in the event it was drawn into litigation. On June 18, 2001, the parties exchanged e-mails regarding the scope and content of an indemnification agreement, as well as a revised delivery schedule. Sellers memorialized these discussions in an e-mail circulated on June 22, 2001, indicating that Myron "would be comfortable proceeding with this order if" sellers signed an indemnification agreement and put up a standby letter of credit for $.25 per unit ordered in case of patent litigation, and Myron would open a letter of credit for the purchase of the calculators. This e-mail also stated that sellers "need[ed] to have the final purchase orders faxed to us," and that they could "start producing the units" as soon as "we all are comfortable with" these terms.
The record indicates that the parties unsuccessfully attempted to negotiate a mutually acceptable indemnification agreement and letter of credit terms between mid-June and mid-July 2001.

C. The Fall Out

Ultimately, in light of their final communications, sellers never produced the Version II calculators, but instead commenced an action for damages against Myron in California in August 2001.[4] On October *790 25, 2001, Myron advised sellers that it was revoking its acceptance of 100,000 Version I calculators.
In addition, Myron asserted that it was withholding payment on other transactions. As the record reveals, Myron had ordered and received from sellers shipments of flashlights, pocketknives, travel alarm clocks and stainless steel mugs. Myron has not disputed that it did not pay for these items as payment became due on various dates in July and August 2001, but instead asserted that it was entitled to withhold payment as an offset against the damages it claims to have incurred as a consequence of the allegedly wrongful "royalty" charges and as a consequence of the Version II calculator dispute. Myron's refusal to pay for these goods formed the basis for sellers' claim that these goods were converted. The jury determined that Myron did indeed convert these goods, and awarded $102,554.14 in damages and prejudgment interest. The jury also awarded punitive damages against both Myron corporations in the total amount of $800,000; the judge reduced that amount to $700,000-$350,000 as to each Myron corporation.
Sellers also asserted that damages should have been awarded for Myron's alleged spoliation of evidence. That claim was based on the statement in Myron's counsel's October 25, 2001 setoff letter that approximately 80,000 Version I calculators had been "disposed of as garbage." Myron, however, later retracted its statement that these calculators had been discarded, claiming that the calculators had actually been sold, used as samples, or otherwise expended in the course of its business. The jury found in favor of Myron on this spoliation claim.
Myron asserted a number of causes of action in its counterclaim, including constructive fraud, fraudulent concealment, equitable fraud, negligent misrepresentation, breach of warranty, and an entitlement to an offset against any damages to which sellers might be entitled. As mentioned earlier, the jury found in favor of Myron on its negligent misrepresentation claim and awarded $58,840; the judge vacated that award.

II
Following the entry of judgment in favor of sellers, Myron appealed, arguing that: (1) the trial judge erred in denying its motion for a directed verdict, or for judgment notwithstanding the verdict, on sellers' breach of contract claims regarding the Version II calculator purchase orders, or, in the alternative, that the jury charge regarding these claims was inadequate; (2) the trial judge erred in refusing to set aside the verdict on sellers' conversion claims, or, in the alternative, that the charge regarding the conversion claim was inadequate; (3) the trial judge erred in refusing to set aside the punitive damage award because it exceeded the statutory maximum, N.J.S.A. 2A:15-5.14,[5] and was predicated on a conversion claim that had no merit; (4) the trial judge erred in setting aside the verdict entered in Myron's favor on its negligent misrepresentation claim; and (5) the verdict, on the whole, *791 was the product of passion, prejudice or partiality, and should have been set aside.
Sellers argued in their cross-appeal and separate appeal that the trial judge erred: (1) in failing to award attorneys' fees in their favor, alleging that fees should have been awarded (a) based on the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20,[6] (b) because of Myron's alleged failure to admit facts in response to sellers' request for admissions, R. 4:23-3, (c) because they believed that Myron's opposition to a motion for summary judgment was in bad faith, R. 4:46-6, and (d) based on the frivolous litigation statute, N.J.S.A. 2A:15-59.1; (2) in reducing the punitive damages award; (3) in reducing the prejudgment interest award; and (4) in failing to include certain expenses in the costs taxed against Myron.
After careful consideration, we reject Myron's arguments that whether a contract was formed regarding the Version II calculators and whether the warranty against infringement was breached should have been resolved as a matter of law. These questions were so mired in factual disputes and uncertainties that they could not have been decided by motion. We nevertheless reverse and remand for a new trial because we conclude that the jury instructions with respect to these chief contentions were inadequate.

A. Contract Formation

We reject Myron's contention that the contract formation dispute should have been decided by the judge and not the jury, and conclude that the trial judge correctly denied Myron's motions for a directed verdict and for a judgment notwithstanding the verdict.
A judge is required to direct a verdict or grant a judgment notwithstanding the verdict only if, upon accepting as true all the evidence that supports the opponent's position, and upon providing the opponent with all reasonable inferences, reasonable minds could not differ. See, e.g., Estate of Roach v. TRW, Inc., 164 N.J. 598, 612, 754 A.2d 544 (2000); Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 415, 690 A.2d 575 (1997). As described by the Court in Ferdinand v. Agricultural Ins. Co., 22 N.J. 482, 494, 126 A.2d 323 (1956), where the evidence and uncontradicted testimony is "plain and so complete that disbelief of the story could not reasonably arise in the rational process of an ordinary intelligent mind, then a question has been presented for the court to decide and not the jury." See also Frugis v. Bracigliano, 177 N.J. 250, 269, 827 A.2d 1040 (2003). Whether a contract regarding the Version II calculators was formed was a question mired in factual disputes and uncertainties.
The era when a valid, binding contract could only come into existence when a party's acceptance mirrored the other party's offer ended with the adoption of the Uniform Commercial Code (UCC). The UCC altered the common law approach, finding it to be inconsistent with the modern realities of commerce. As cogently explained by Professors White and Summers, Article 2 of the UCC "radically altered sales law" and "expand[ed] our conception of a contract." White and Summers, Uniform Commercial Code (5th ed.) § 1-2 at page 51. The heart of this revolutionary change in contract law can be found in N.J.S.A. 12A:2-207(1), which declares that "[a] definite and seasonable expression of acceptance or a written confirmation *792 which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms" (emphasis added). No longer are communicating parties left to debate whether an acceptance perfectly meets the terms of an offer, but instead the existence of a binding contract may be based on words or conduct, which need not mirror an offer, so long as they reveal the parties' intention to be bound. In other words, as stated in N.J.S.A. 12A:2-207(3):
Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.
If there is conduct that reveals an intent to establish a contract, then the contract will include those terms "on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions" of the UCC. Ibid.
Considering that the UCC permits the formation of a contract by way of conduct that reveals the parties' understanding that a contract exists, and notwithstanding the suggestion of additional or even nonconforming terms, the complex of communications between these parties demonstrates that neither can the formation of a contract be confirmed or foreclosed without a resolution of the existing factual disputes and the weighing of the significance of the parties' convoluted communications. To generalize about the parties' conduct and communications, we observe that there were preliminary discussions about sellers' ability to produce the so-called Version II calculators, which may have been colored by their experiences with the Version I calculators. In addition, a shadow was cast over their conduct by a brooding concern as to whether sellers could manufacture calculators consistent with Myron's requirements without infringing CCL's patent. With this history as a backdrop, on April 25, 2001, Myron forwarded a purchase order for 1,216,000 Version II calculators, with a firm price of $.57 per unit, and with shipping dates ranging from July 23, 2001 to September 9, 2001. The three other purchase orders were not submitted until after numerous additional discussions and communications between the parties.
Sellers contend that a binding contract was formed upon their oral acceptance of each of Myron's purchase orders. Myron, on the other hand, argues that the parties' intention to contract must be informed by an alleged course of conduct whereby the parties, according to Myron, understood that any modification of the terms of the purchase orders could only occur through the issuance of new purchase orders. In this regard, Myron refers to the purchase orders themselves, which indicate that, to be binding, any modification of their terms would have to be in a writing signed by Myron:
No other agreement in any way modifying any said terms and conditions will be binding upon [b]uyer unless made in writing and signed by [b]uyer's authorized representative.
Myron contends that this provision was not empty verbiage. As support, Myron has referred to prior transactions during which the parties had conducted themselves in a manner consistent with this provision. For example, when a change in price was discussed during the Version I transactions, there was an insistence upon the issuance of new purchase orders to memorialize the upcharge.
Here, too, Myron argues that the discussion regarding shipping dates that followed *793 the issuance of the first purchase order meant that the parties did not intend to be bound until new purchase orders reflecting the revised shipping dates were executed and forwarded. In this regard, Myron cites sellers' e-mail of May 29, 2001, in which sellers urged that what was then "need[ed] is revised purchase orders reflecting the shipping dates listed above," thus posing the rhetorical question: if there was already a binding contract, and if the shipping dates were matters that could be modified through words or conduct, then why did sellers request  as necessary  new revised purchase orders? In short, Myron urges that all that occurred up until the time the parties failed to agree on an indemnification agreement was merely executory or contingent upon both parties' firm and complete agreement on these terms. Myron summarizes the parties' communications in the following way: (1) "Myron made offers in the form of the four Version II purchase orders"; (2) sellers did not accept the purchase orders, "but instead made a counteroffer with new delivery dates"; and (3) as this counteroffer was pending, "the patent infringement issue was re-exposed, resulting in [sellers'] unsuccessful attempt at a further redesign of the Version II calculators to avoid the infringement issue," and "[w]hen that failed, several proposals and counterproposals" regarding an indemnification and a letter of credit bore no fruit.
Myron forcefully argues that these facts and circumstances reveal that a binding contract was never formed. Myron's contention that sellers' response was not an acceptance but a counteroffer could ultimately be found accurate depending upon how the facts and circumstances are interpreted by the factfinder.
But, sellers have also presented a colorable argument that their oral acceptance of Myron's purchase orders formed a binding contract, and that their subsequent discussions were merely offers to modify or add to the terms of the binding contract, which, whether accepted or rejected, would not undermine the contract that had formed. In that circumstance, the terms proposed by sellers  here, a delivery schedule different from what was contained in Myron's purchase orders  would become "part of the contract unless":
(a) the offer expressly limits acceptance of the terms of the offer;
(b) they materially alter it; or
(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
[N.J.S.A. 12A:2-207(2)]
Certainly, the general facts and circumstances outlined earlier might but do not necessarily compel a conclusion  as argued by Myron  that it demanded strict and timely compliance with the delivery schedule contained in its purchase orders or that strict and timely compliance was material to the contract. Myron's initial purchase order called for the purchase of 1,216,000 calculators to be shipped on various dates from July 23, 2001 to September 1, 2001, with arrival at Myron's New Jersey facility on various dates between August 27, 2001 and October 2, 2001. Myron's intent was to have these calculators available prior to the Christmas season, and not necessarily on the precise dates indicated in the purchase order. In addition, it appears that Myron understood that sellers were still finishing their design work on the Version II calculators, and that Myron had not yet determined the ultimate size of its entire purchase of Version II calculators.
As a result, in early May 2001, Myron inquired whether sellers could manufacture 4,000,000 units and ship them by November 1. It is arguable that this request *794 placed the overall timing of delivery of all units in flux, or at least demonstrated that so long as received in time for the Christmas season, that the particular dates contained in the first purchase order were not material. Within a few days, sellers responded by providing a shipping schedule for 4,000,000 units, with November 11, 2001 as the last shipment date. Sellers expressly stated that "[t]o keep this schedule," Myron would have to approve the samples that had been provided and "confirm[] everything by this Thursday, May 10th." Although Myron confirmed on May 8, 2001 that this schedule was acceptable, it did not issue its second, third and fourth purchase orders by May 10, 2001. In a further communication on May 16, 2001, sellers indicated that if "an order is confirmed today," the 4,000,000 units could be manufactured and shipped based upon the May 8 schedule. Still, the second, third and fourth purchase orders were not forwarded until May 25, 2001, allegedly causing an alteration of the prior delivery schedule.
It may be argued from these communications that Myron's offer to purchase represented by the first purchase order, as well as the other three, did not "expressly limit[ ] acceptance" to its terms. N.J.S.A. 12A:2-207(2)(a). The subsequent communications might be interpreted as suggesting the contrary; indeed, it was Myron that suggested an alteration of the overall delivery schedule by questioning, following the submission of its first purchase order, whether and when sellers could ship a total of 4,000,000 units. On the other hand, it is not at all clear from these communications whether or when an agreement regarding the delivery schedule was reached.
The parties' disagreements regarding the materiality of the precise schedule and whether an agreement was reached about an altered delivery schedule raised questions of fact that could not be resolved by motion. Moreover, it is not at all clear that these circumstances may only be interpreted in a way that requires a finding that a binding contract was not formed.
In short, it is conceivable  and the jury could find  that the parties' inability to agree on certain terms reveals the lack of an intent to be bound; in other words, that their communications constituted mere negotiations that never ripened into a contract. By the same token, the jury could find that a contract was formed despite a failure or an inability to agree on all terms. N.J.S.A. 12A:2-207(2) provides that an acceptance coupled with the proposal of new or different terms does not necessarily preclude the formation of a contract. In such a circumstance, either the new or different terms proposed by the offeree would become part of the contract or those terms could be provided by the gap-filling provisions of the UCC. See, e.g., Richardson v. Union Carbide Indus. Gases, Inc., 347 N.J.Super. 524, 532-33, 790 A.2d 962 (App.Div.2002).
All these questions required that the factfinder analyze the meaning and significance of the parties' communications based upon the legal framework provided by the UCC. As a result, we cannot agree with Myron that the trial judge should have resolved these fact-sensitive matters by granting either a motion for a directed verdict or judgment notwithstanding the verdict.

B. Warranty Against Infringement

We likewise reject Myron's argument that the trial judge should have held, as a matter of law, that sellers breached the warranty against infringement that attached to the alleged contract for the sale of Version II calculators. This argument requires consideration of N.J.S.A. 12A:2-312(3), *795 an infrequently litigated section of the UCC, which declares that "[u]nless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications" (emphasis added). As with the competing arguments concerning whether a contract was formed, this claim of a breach of the warranty against infringement requires consideration of the UCC's many interlocking parts and, ultimately, the jury's resolution of the applicable and relevant facts.
The obvious intent underlying N.J.S.A. 12A:2-312(3) is to protect the buyer against patent and trademark claims that may be asserted against the goods purchased. Such a warranty, however, does not extend to all circumstances in which the goods infringe a third party's patent or trademark. Indeed, as Professors White and Summers have stated, this provision is "unique in imposing a warranty on the buyer," White and Summers, supra, § 9-16 at page 688, as when the buyer furnishes the seller with the specifications for the goods manufactured and sold. Although it has not been argued that this aspect of N.J.S.A. 12A:2-312(3) has application here, its existence suggests that the warranty against infringement should be viewed practically, not rigidly.
One of the difficult questions posed by the application of N.J.S.A. 12A:2-312(3) is pinpointing when a "claim" by a third party of infringement, whether or not disputed by the seller, ripens into a breach of the warranty against infringement. In short, it is not every "claim" but, in the words of the statute, only a "rightful claim" of infringement that constitutes a breach of this warranty.
In American Container Corp. v. Hanley Trucking Corp., 111 N.J.Super. 322, 268 A.2d 313 (Ch.Div.1970), Judge Herbert considered a dispute between the buyer and seller of an allegedly stolen truck. There, the court attempted to define the scope of the warranty of title imposed by N.J.S.A. 12A:2-312(1), stating:
The purchaser of goods warranted as to title has a right to rely on the fact that he will not be required, at some later time, to enter into a contest over the validity of his ownership. The mere casting of a substantial shadow over his title, regardless of the ultimate outcome, is sufficient to violate a warranty of good title.
[American Container Corp., supra, 111 N.J.Super. at 331, 268 A.2d 313 (emphasis added).]
This "substantial shadow" description is as apt as any other in describing what constitutes a "rightful" claim of infringement by a third party,[7] and although in many cases its application regarding a title dispute may be soluble by motion, its application in a warranty against infringement dispute will doubtless often require resolution by the factfinder after weighing the nature and facts of the third party's claim.
In Yttro Corp. v. X-Ray Marketing Assoc., Inc., 233 N.J.Super. 347, 352, 559 A.2d 3 (App.Div.1989), we embraced Judge Herbert's "substantial shadow" approach in determining when a warranty against infringement has been breached. Again, this does not mean that any shadow causes *796 a breach. Instead, as observed by Professors White and Summers in discussing the reach of the warranty of title, "there is some point at which the third party's claim against the goods becomes so attenuated that we should not regard it as an interference against which the seller has warranted"; in short, the ultimate problem "lies in defining that point." White and Summers, supra, § 9-16 at page 687. In observing that "the courts have yet to work out this problem," these commentators have suggested "at least two plausible alternatives":
A court might hold a seller liable for expenses incurred in successfully defending against an inferior claim only if the seller knew or had reason to know that such a claim was likely to be asserted. Or a court could analogize to the standards used to determine whether title to real property is marketable, specifically, whether the claim is of such a substantial nature to subject the buyer to serious litigation. While this statement of the standard is vague, it at least makes clear that frivolous claims or those arising only long after sale should not give rise to warranty of title liability, and it provides reference to a well-developed body of case law[[8]].
[Ibid.]
Although these comments were directed toward defining the contours of the warranty of title imposed by N.J.S.A. 12A:2-312(1), we agree that the substance of the shadow cast over goods must be similarly viewed when determining whether the third party's claim of infringement is "rightful." White and Summers, supra, § 9-16 at page 687.
One of the few courts to have considered this issue acknowledged the difficulties in defining what constitutes "a rightful claim" of infringement:
If claims of patent infringement are seen as marks on a continuum, whatever a "rightful claim" is would fall somewhere between purely frivolous claims, at one end, and claims where liability has been proven, at the other.
[84 Lumber Co. v. MRK Technologies, Ltd., 145 F.Supp.2d 675, 680 (W.D.Pa. 2001).]
While declining to "decide precisely what constitutes a rightful claim of patent infringement," the district judge in 84 Lumber observed that the question could not be addressed without inquiring into the nature of the infringement claim, and "without comparing the scope of the patents at issue with the allegedly infringing products." Ibid.
We agree that a frivolous infringement claim does not generate a breach of the warranty described in N.J.S.A. 12A:2-312(3) any more than a buyer is obligated to prove the seller's liability for infringement to succeed in demonstrating a breach of this warranty. A third party's claim of infringement  to be "rightful" within the meaning of N.J.S.A. 12A:2-312(3)  must cast a "substantial shadow" on the buyer's ability to *797 make use of the goods in question, in order to constitute a breach of the warranty against infringement. In this context, we agree with the holding in 84 Lumber that resolution of this question requires the factfinder's analysis of the patent and the claim of infringement. Again, this does not mean that Myron would have to actually prove the validity of the infringement claim to succeed on this warranty argument, only that CCL's claim had sufficient substance to unduly disturb Myron's ownership and disposition of the goods in question. In other words, to prove that a seller breached a warranty because goods were the subject of a third party's rightful claim of infringement, a buyer must establish that the infringement claim is of a substantial nature that is reasonably likely to subject the buyer to litigation, and has a significant and adverse effect on the buyer's ability to make use of the goods in question. The uncertainty about the substance of CCL's claim was not so free from question as to permit the disposition of this contention by the judge as a matter of law. As a result, we conclude that, in light of the record presented at trial, the judge correctly denied Myron's motions and permitted the matter to be decided by the jury.[9]
We observe that the parties have expended some effort disputing the bona fides of their attempts to reach an agreement about CCL's infringement claim, and the significance of their failure to ultimately reach an agreement. These facts are not without relevance. Part of determining the length of the shadow cast over these proposed transactions by CCL's infringement claim is the degree to which the sellers would accommodate Myron's concerns about the CCL claim.
Sellers contend that they were amenable to resolving any doubts in this regard, but that Myron refused to accede to what sellers *798 claim were highly favorable accommodations as a means for avoiding Myron's obligation on its purchase orders. When this matter is retried, the jury should consider whether the CCL claim was significant or insignificant by additionally weighing whether sellers were ready, willing and able to fully indemnify Myron from any damage or inconvenience that Myron might have suffered if it had fulfilled its part of the alleged bargain. Indeed, in conjunction with this evidence, the jury may also consider whether Myron acted reasonably, or in keeping with the implied covenant of good faith and fair dealing, in rejecting as inadequate sellers' proposals regarding indemnification.
In reaching our conclusion that the trial judge properly permitted, on this record, the breach of warranty contention to go to the jury, we also state our disagreement with sellers' contention that the breach of warranty claim should be rejected as a matter of law. Sellers argue that the warranty against infringement does not attach until delivery of the goods, citing the language of N.J.S.A. 12A:2-312(3) (emphasis added) in this regard: "a seller . . . warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like. . . ." We reject the argument that Myron had no legal recourse regarding these goods and the potential infringement claim until such time as the goods were delivered.
Moreover, implicit in the parties' communications in and around May and June 2001 was their shared concern that the process of designing and manufacturing 4,000,000 calculators would not be pursued in vain. To generalize what the parties might have been thinking about the proposed transaction, it seems likely, among other things, that sellers sought assurance that Myron would actually perform its part of the bargain, and Myron was concerned that sellers could manufacture the product it desired and in a timely fashion. It is probably fair to conclude that the last thing either party wanted was litigation, let alone litigation plus a warehouse full of unwanted calculators. We think it represents an overly technical and impractical view of N.J.S.A. 12A:2-312(3) to suggest that because sellers did not go to the trouble and expense to manufacture and ship 4,000,000 calculators from Asia to New Jersey, when it already knew Myron would reject these goods and not willingly pay for them, that Myron was foreclosed from claiming a breach of the warranty against infringement.

III
Having concluded that the trial judge correctly determined that the contract formation and warranty against infringement contentions raised fact questions to be decided by the jury, we nevertheless conclude that the instructions regarding contract formation, the warranty against infringement and conversion were fundamentally flawed; that the charge was complicated by the judge's unnecessary inclusion of equitable claims and defenses; and that, on the whole, the charge was inadequate and provided insufficient guidance for the jury's resolution of the issues presented.

A
Appropriate and correct jury instructions are essential for a fair trial. As the Court said in Velazquez v. Portadin, 163 N.J. 677, 688, 751 A.2d 102 (2000) (quoting Jurman v. Samuel Braen, Inc., 47 N.J. 586, 591-92, 222 A.2d 78 (1966)), jury charges "must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to *799 the facts as it may find them." It would not be helpful to our determination of whether the judge's charge met this standard to review it line-by-line. The instructions were erroneous in a number of key respects. In addition, examination of the entire charge  and it is on the whole that a charge must be judged, Jurman, supra, 47 N.J. at 592, 222 A.2d 78  reveals that the judge did not provide the jury with sufficient guidance in this difficult case because he failed to relate the applicable legal principles to the parties' specific contentions.

B
In describing for the jury what it takes for the parties to form a binding contract, the judge stated:
A proposal to accept an offer on any different terms is not an acceptance of the original offer. If any new or different terms are proposed in response to the offer, the response is not an acceptance, but rather a counteroffer. A counteroffer is a new offer by the party making that proposal. The new offer must in turn be agreed to by the party who made the original offer for there to be an acceptance.
As we have already explained, the UCC does not require that a party's response mirror an offer to result in a binding contract. The offeree may propose additional or different terms without necessarily having the response viewed as a non-binding counteroffer. Instead, an offeree's proposal of additional or conflicting terms may be found to constitute an acceptance, and the other or different terms viewed as mere proposals to modify the contract thus formed. See N.J.S.A. 12A:2-207(1) and (3).
The judge's misstatement in this regard was hardly harmless even though it constituted a brief passage in a lengthy charge and even though it created a more stringent standard for determining the existence of a binding contract than required by the UCC, which would have benefited Myron, not sellers. Nevertheless, the point is that contract formation was one of the chief issues to be decided and a linchpin to the resolution of many of the other issues. In describing when the law recognizes that a contract was formed, the judge provided the jury with erroneous instructions that struck directly at the heart of the case.

C
Myron has also argued that the judge's instructions regarding the tort of conversion were erroneous. We agree and, in fact, conclude that the conversion claim must be dismissed.
The judge instructed the jury on conversion in the following way:
Let me tell you about conversion. To constitute a conversion of goods there must be some act by the defendant in derogation of the owner's right to the goods or some exercise of dominion over them by the defendant inconsistent with the owner's right thereto, or some act done which has the effect of destroying the quality of the goods.
Where a sale calls for a cash payment, it is a conditional sale. In a conditional sale, unless or until the goods are paid for, the title to the goods remains with the seller.
Myron objected, arguing that the description of the parties' rights in that circumstance was inconsistent with N.J.S.A. 12A:2-401(2). We agree.
"Conversion consists of the wrongful exercise of dominion and control over property owned by another inconsistent with the owners' rights." Port-O-San *800 Corp. v. Teamsters Local Union No. 863 Welfare & Pension Funds, 363 N.J.Super. 431, 440, 833 A.2d 633 (App. Div.2003) (quoting Commercial Ins. Co. of Newark v. Apgar, 111 N.J.Super. 108, 114-15, 267 A.2d 559 (Law Div.1970)). Therefore, the property allegedly converted "must have belonged to the injured party." Commercial Ins. Co. of Newark, supra, 111 N.J.Super. at 115, 267 A.2d 559. In the context of a sale of goods, the viability of a conversion claim turns on which party holds title when the purported conversion takes place.
N.J.S.A. 12A:2-401(2) provides that:

Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading
(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
(b) if the contract requires delivery at destination, title passes on tender there.

[Emphasis added.]
As the Uniform Commercial Code Comment indicates, N.J.S.A. 12A:2-401(2) "actually base[s] the test [of whether title passes] upon the time when the seller has fully committed himself in regard to specific goods." The seller thus commits itself by making the shipments in a "shipment" contract. For example, in Nopco Chem. Div. of Diamond Shamrock Chem. Corp. v. Blaw-Knox Co., 59 N.J. 274, 278-79, 281 A.2d 793 (1971), the plaintiff agreed to purchase a piece of machinery from the defendant; the contract called for delivery to the plaintiff "F.O.B. Buffalo, New York," which meant that "passage of title and risk of loss to the plaintiff occurred when [the defendant] delivered the machine to plaintiff's carrier at its Buffalo factory." Or, as we stated in State v. Lamb, 125 N.J.Super. 209, 216, 310 A.2d 102 (App.Div.1973), "under the Uniform Commercial Code, N.J.S.A. 12A:2-401(2), title to goods pass to the buyer upon delivery unless otherwise specifically agreed."
The sale of Version I calculators called for delivery in Asia. There was no dispute that the goods were so delivered, but not paid for. We agree with Myron that the disputes regarding these goods and Myron's withholding of payment could only give rise to a breach of contract claim and could not generate a viable conversion cause of action. Because the goods were delivered, title passed to Myron; there is nothing in the record to suggest otherwise. Accordingly, Myron could not be held to have converted property to which it held title.

D
The trial judge also charged the jury on various equitable concepts. Many of these principles  most of which sellers urged in response to Myron's counterclaim  if at all relevant in this case were matters to be decided by the judge, not by the jury.
The fact that a single civil action may contain both legal and equitable claims and defenses is hardly unusual. The ramifications of this circumstance are most acute when, unlike here, the equitable nature of the action predominates, and appended legal claims are merely ancillary to the equitable claim lying at the *801 heart of the dispute. In that event, our courts occasionally are required to determine whether the equitable issues are dominant or whether the issues are so intertwined "that the legal issues fell within the [chancery] court's power to adjudicate them without a jury." Boardwalk Properties, Inc. v. BPHC Acquisition, Inc., 253 N.J.Super. 515, 528, 602 A.2d 733 (App.Div.1991). When presented with such a conflict, the "jurisdiction of a chancery court is to be exercised with a sensitive regard for the right to trial by jury," because it is "not an `inflexible rule' that chancery, having once acquired jurisdiction, should retain the case `to settle all the rights of all the parties.'" Lyn-Anna Properties, Ltd. v. Harborview Dev. Corp., 145 N.J. 313, 329-30, 678 A.2d 683 (1996) (quoting Shaw v. G.B. Beaumont Co., 88 N.J.Eq. 333, 336, 102 A. 151 (E. & A.1917)). In short, "it is not true, by any means, that when a court of conscience has acquired cognizance for one purpose, it thereby acquires cognizance over the entire controversy for all purposes." Lyn-Anna, supra, 145 N.J. at 330, 678 A.2d 683 (internal quotations omitted).
By the same token, when a suit is lodged in the Law Division because the principal relief sought is legal, a demand for trial by jury does not envelope any equitable claims also pleaded and does not mandate that the jury exercise the court's equity jurisdiction. When equitable claims or defenses are lodged in what is predominantly a dispute at law, and when the claims may be viewed separately without fear of inconsistent determinations, the court must parse the equitable issues from the legal issues presented to the jury. We would expect that in many cases the path toward the resolution of these ancillary equitable issues may well be blazed by the jury's resolution of the legal issues, which ought normally to be resolved first. See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 479, 82 S.Ct. 894, 900-01, 8 L.Ed.2d 44, 52 (1962); Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 508, 79 S.Ct. 948, 955, 3 L.Ed.2d 988, 996 (1959). But, regardless of the ordering of the proofs, the ultimate determination of equitable matters is for the judge alone to decide, see GEI Intern. Corp. v. St. Paul Fire and Marine Ins. Co., 287 N.J.Super. 385, 393, 671 A.2d 171 (App.Div.1996) (holding that "[i]t is the court which is the instrumentality intended to utilize equitable factors"), aff'd, sub nom. Ciba-Geigy Corp. v. Liberty Mut. Ins. Co., 149 N.J. 278, 693 A.2d 844 (1997); 1 John N. Pomeroy, Equity Jurisprudence § 116 (5th ed., 1941) (observing that "a jury is clearly incompetent to frame and deliver a decree according to the doctrines and methods of equity").
As is clear here, not only did the trial judge cede his equity jurisdiction to the jury, but he also further burdened the jury with questions and concepts that it need not have heard.
When the matter is retried, the judge should not charge the jury on equitable issues and concepts that have no bearing on the legal issues presented. Instead, once the jury renders its verdict on the legal claims, to the extent necessary the judge should resolve any lingering, relevant equity issues.

E
We should add that the judge's charge regarding the warranty of infringement is not consistent with what the law required. Therein, the trial judge stated that "a seller of goods has a duty to make certain that no claim of infringement will cloud or mar the buyer's title . . ." (emphasis added). It is not any claim of infringement but only a "rightful claim" that will generate a breach of the warranty against infringement. N.J.S.A. 12A:2-312(3).
*802 The jury should have been instructed on the legal principles we discussed more thoroughly earlier in this opinion. Proper instructions would have required that the judge inform the jury that it was required to consider the substance of the third party's claim of infringement and whether that claim was of a substantial nature reasonably likely to subject the buyer to litigation, and whether that claim has a significant and adverse impact on the buyer's ability to make use of the goods.

F
We need not consider further whether other legal principles described by the judge were accurately stated. In light of the material errors recounted above, we would also simply conclude that the charge was inadequate because of the failure of the judge to explain the applicable legal principles to the particular claims of the parties. To explain, it is helpful to generally outline the contents of the charge.
The trial judge first correctly and thoroughly described for the jury their role, as well as his and the attorneys' roles. He then advised the jury that the evidence before them consisted of the testimony of the witnesses, which he listed by name, the more than 100 exhibits, which he referred to solely by their identification numbers, and any answers to interrogatories and deposition testimony that may have been read to them.
Following this, the judge described for the jury the claims and contentions of the parties by briefly summarizing the legal theories alleged in the pleadings without further elaboration. In comparison to the summary of the claims that we briefly recited earlier in the opinion, the trial judge's description of all the claims and defenses asserted by the parties was contained in less than three transcript pages. Sandwiched into the judge's definitions of the burden of proof, and what it means to prove something by a preponderance of the evidence and by clear and convincing evidence, were the judge's instructions regarding which burden of proof applied to each of the numerous legal theories asserted by the parties. Following his further defining of when evidence preponderates and when evidence is clear and convincing, the judge then correctly described for the jury direct and circumstantial evidence, credibility, and the manner in which a witness's credibility may be assessed.
At this point, the trial judge recited for the jury black letter definitions and descriptions of a blizzard of contract law concepts without explaining how they bore on the parties' factual contentions. The judge advised the jury on: what constitutes a bilateral contract; when a contract may be expressed or implied; when and what types of implied terms may be encompassed by a contract; what is meant by an offer and what is meant by an acceptance of an offer; what constitutes adequate consideration; what constitutes a course of performance and how it might modify or otherwise impact upon expressed and implied terms; what is the definition of the implied covenant of good faith and fair dealing, and its relationship to other contractual terms; how an agreement may be modified or rescinded, or when performance may be waived; what circumstances represent a material breach of contract; when a contracting party has substantially performed; what the nonbreaching party's rights are when the other party breaches a contract; and what constitutes an anticipatory breach of a contract. The judge also provided, verbatim, various provisions of the Uniform Commercial Code, including: the definition of course of dealing; the three circumstances that represent an acceptance of goods; what it means to accept goods; what constitutes *803 the rejection of goods; what the parties' rights and obligations are when goods have been rejected; when is a reasonable time for rejection and what is a seasonable time for rejection; what a party must do to revoke acceptance and when must revocation occur; what is meant by the right to adequate assurance of performance; under what circumstances will a breach of warranty occur; when warranties may be excluded or modified; and what is meant by the warranty of title and the warranty against infringement.
The judge also defined: fraud and all its elements; what constitutes a statement of opinion as opposed to a statement of fact; the meaning and elements of fraudulent concealment; equitable fraud; the defense of misrepresentation; what constitutes negligent misrepresentation; what is privity of contract and its relationship to agency concepts; waiver; estoppel; laches; unclean hands; rescission; and conversion. The judge further defined what constitutes a conditional sale; and when a spoliation of evidence has occurred. He also defined negligence and proximate cause.
As with all these legal concepts, the judge  without relating the legal principles to the factual circumstances of this case  defined what constitutes compensatory damages, consequential damages, damages for non-acceptance of goods, incidental damages, loss of profits, fair market value, and the obligation to mitigate damages. And the judge also explained what damages might be awarded if it was found that Myron converted any goods or spoliated any evidence.
Following additional instructions regarding the jury's obligation to decide the case fairly and impartially, without any sympathy, bias, passion or prejudice, and other instructions regarding jury deliberations, the judge then read to the jury all the questions contained in an eighteen-page verdict form.
We have provided a few instances in which the judge gave incorrect instructions. Many of the other instructions constituted correct statements of law. But the judge simply recited these legal definitions and principles without linking them to the factual controversy that the jury was charged with deciding. He did not "plainly spell out how the jury should apply the legal principles to the facts as it may find them." Jurman, supra, 47 N.J. at 592, 222 A.2d 78.
It would be hard to find a case more in need of a careful explanation of how the appropriate legal principles should be applied to a particular set of factual contentions. The jury was burdened with the obligation of sorting through the various factual contentions, and the meaning of the parties' numerous communications; it required the judge's explanation of the application of the legal concepts to the claims, counterclaims and defenses to those factual disputes. Although, as we have mentioned, there are many statements contained in the charge which are correct on their face, the complete absence of an analysis of the statements of law to the parties' contentions left the jury without the guidance it required in this perplexing dispute.
We are not insensitive to the fact that charging the jury in this case in a clear and helpful manner certainly constituted a considerable challenge. The contract principles that the jury was required to apply to the fact disputes are not easily grasped by a jury of lay persons. Regardless of the difficulty, a judge's failure to provide a jury with clear and accurate instructions regarding the material aspects of a case, as occurred here, mandates a new trial.
*804 We assume that the judge's reading of the charge spanned nearly two hours, and the inclusion of explanations throughout the charge as to how the jury should apply each legal standard would have greatly added to this lengthy charge. Such a charge would place a considerable burden on a jury already saddled with the task of applying difficult legal concepts to a convoluted set of facts.
We suggest that when the matter is retried, the judge consider breaking up the charge by first instructing the jury, and obtaining a verdict, on the contract formation issues. Upon the rendering of a verdict on those issues, the judge could then instruct the jury on the remaining issues in light of its finding on the formation issues. We only commend and do not mandate such an approach; we leave it to the judgment and discretion of the trial judge. The judge may also consider providing the jury with a written copy of all or part of his charge in this complex matter. R. 1:8-8(a).

IV
At trial, sellers also presented a spoliation of evidence claim. This claim should have been dismissed. Although Myron's counsel sent a letter to plaintiffs on October 25, 2001, which indicated that Version I calculators had been discarded, the record reflects no dispute that other Version I calculators were available to the extent that a physical examination of these items had relevance to the lawsuit. Even though it may be true that those Version I calculators which were actually delivered to Myron were no longer available, sellers failed to demonstrate how they were damaged by this fact. We agree that there was no merit to sellers' claim in this regard and that, even though the jury also rejected it, the claim should have been dismissed at the close of evidence. As a result, we direct that the spoliation of evidence claim be dismissed following our remand.

V
To summarize, the trial judge correctly denied Myron's various motions for a directed verdict and for judgment notwithstanding the verdict regarding the disputes relating to the Version II calculators, but we conclude that the trial judge's jury instructions in this regard were inadequate and require a new trial. We agree with Myron that the judge should have granted a directed verdict on sellers' conversion claim, and that, as a result of that determination, the punitive damage award should have been set aside. There being no other basis for an award of punitive damages, that aspect of sellers' bundle of claims must be stricken following our remand. And we also hold that the spoliation of evidence claim should have been dismissed and must be dismissed by the trial judge following our remand.
We need not reach Myron's remaining argument, i.e., that the trial judge erred in remitting the jury's award in favor of Myron on its counterclaim for negligent misrepresentation. Because we have concluded that the judge's charge was inadequate as to all the issues to be resolved by the jury, we conclude that this claim must also be retried.
Sellers asserted in their cross-appeal and separate appeal that the trial court erred (1) by failing to award attorneys' fees, (2) in reducing the punitive damage award, (3) in choosing the date from which prejudgment interest would run on the damage award, and (4) in failing to include various expenses in the costs taxed against Myron. The second argument has been rendered moot by our mandate that the claim for punitive damages be stricken; *805 we need not resolve the other three arguments in light of our determination that a new trial is required.
Reversed and remanded for a new trial.
NOTES
[1] This schedule indicated that shipments would begin in early July.
[2] Sellers asserted at trial that even if a binding contract for the purchase of any of the 4,000,000 Version II calculators was not formed, Myron was responsible for the cost of the molds based on the promises contained in this May 21, 2001 e-mail.
[3] As mentioned earlier, a discussion between CCL and Myron representatives at a trade show in New York City on May 23 allegedly caused Myron to question whether Sun Coast was authorized to sell the Version I calculators.
[4] That action was dismissed, and the sellers commenced the suit at hand on October 31, 2002.
[5] The judge reduced the punitive damage awards from $400,000 per defendant to $350,000 per defendant, ostensibly bringing the judgment in line with the requirements of N.J.S.A. 2A:15-5.14 ("[n]o defendant shall be liable for punitive damages in any action in an amount in excess of five times the liability of that defendant for compensatory damages or $350,000, whichever is greater"). Myron argues that to the extent an award of punitive damages was permitted, it should have been limited to a total of $350,000 because the Myron corporations should have been viewed as a single entity for purposes of this lawsuit.
[6] N.J.S.A. 56:8-19 defines the scope of legal and equitable relief permitted by the Consumer Fraud Act and indicates that "[i]n all actions under this section the court shall also award reasonable attorneys' fees, including filing fees and reasonable costs of suit."
[7] Some commentators have not entirely embraced this approach. See White and Summers, supra, § 9-16 at page 687.
[8] The body of case law alluded to, which the commentators referred to as informing the manner in which the warranty of title should be viewed, includes the concept that "[e]very purchaser of land has a right to demand a title which shall put him in all reasonable security, and which shall protect him from anxiety, lest annoying, if not successful suits be brought against him." Dobbs v. Norcross, 24 N.J.Eq. 327, 331 (Ch. 1874). This rule, however, does not mean that any alleged cloud on title triggers a breach of the warranty; only "[i]f it is reasonably probable that the purchaser would be exposed to litigation not of a frivolous nature concerning the title, or would have to bring an action to quiet title," will the title be considered unmarketable. Keown v. West Jersey Title & Guaranty Co., 161 N.J.Super. 19, 23, 390 A.2d 715 (App.Div. 1978).
[9] We should add that the parties have referred us to decisions rendered by the federal courts in the patent infringement suit between sellers and CCL. In arguing that the infringement claim lying at the heart of Myron's claim of the breach of warranty was without substance, sellers referred to the November 22, 2004 written decision of the district court included in the appendix, which granted summary judgment in sellers' favor. Two days before oral argument in this appeal, Myron forwarded to us a copy of the decision of the United States Court of Appeals for the Federal Circuit rendered on April 21, 2006  more than seven months earlier. By way of that unpublished opinion, the court of appeals reversed the summary judgment and remanded for further proceedings. The next day, sellers forwarded to us a copy of a memorandum order entered by the district court on October 11, 2006, which considered the issues remanded to it by the court of appeals and again entered summary judgment in sellers' favor, finding there was "no literal infringement" of CCL's patent by sellers' "original or modified" designs. Other than to advise us of these decisions, the parties have not briefed the significance of the determinations made by these federal courts on the breach of warranty claim. We also have not been informed whether CCL has appealed the district court's October 11, 2006 decision, which summarily determined that the Version I and II calculators do not literally infringe CCL's patent. As we have observed, the substance of CCL's claim is a factor to be determined in resolving Myron's claim of a breach of the warranty against infringement. And its substance  when considered against the record produced at the trial in this matter  raised fact questions to be decided by the jury. Now that the rulings of these federal courts  all decided after the trial in this case  are available, we do not foreclose the trial court's consideration of the warranty claim by way of motion. In other words, we do not preclude either party from seeking a ruling on the merits of the warranty contentions from the judge as a matter of law if the entry of summary judgment in favor of sellers in the federal infringement suit demonstrates that the CCL claim of infringement had insufficient weight to support a breach of the warranty against infringement. We caution, however, that what constitutes a "substantial shadow" over goods is fact-sensitive.